Thomas L. Fishback and another, Administrators, *vs.* G. W. Van Dusen & Co.

| 33 | 111 |
| 40 | 183 |
| 33 | 111 |
| 44 | 117 |
| 33 | 111 |
| f73 | 318 |

### January 21, 1885.

**Sale—Conditional Delivery—Refusal of Payment—Remedy of Seller.** When payment of the purchase-money and the delivery of the goods are expressly or impliedly agreed to be simultaneous, and the payment is omitted or refused by the purchaser upon getting possession of the goods, the vendor may reclaim them, the delivery being merely conditional.

**Same—Conditions not Expressly Declared.**—To constitute a conditional delivery, it is not necessary that the vendor should declare the conditions in express terms at the time of delivery. It is sufficient if it can be inferred from the acts of the parties and the circumstances of the case that it was intended to be conditional.

**Same—Cash Sale—Payment and Delivery.**—Upon a sale for cash, payment and delivery are concurrent and mutually dependent acts, and neither party is bound to perform without contemporaneous performance by the other.

**Same—Waiver of Conditions on Cash Sale.**—But a delivery on a sale for cash is not necessarily a conditional one, for the vendor may waive the conditions and make the sale absolute by an unconditional delivery.

**Same—Waiver a Question of Fact.**—Whether there has been such a waiver is a question of fact, viz.: Has the vendor voluntarily and unconditionally delivered the goods without intending to claim the benefit of the condition that the purchase-money must be paid before the goods pass to the vendee?

**Same—Evidence—Unconditional Delivery.**—Evidence in this case considered, and *held* sufficient to sustain the finding that the delivery was unconditional.

**Same—Executed and Executory Contracts of Sale, etc., Distinguished.** To constitute an *executed* contract of either sale, pledge, or mortgage of goods, some specific property must be *appropriated* to the contract. Until this is done, the contract is merely *executory*, and no property passes to the vendee, pledgee, or mortgagee.

Same—Deposit of Grain, when a Bailment and when a Sale.—Where
a party delivers or deposits grain with another, with an agreement, ex-
pressed or implied, that the latter may use and dispose of it, and fulfil
his obligations to the former by returning an equal amount of other
grain of the same quality, the transaction, in the absence of a statute
changing the rule, constitutes a *sale,* and not a *bailment.*

Same—Warehouse Receipts—Laws 1876, c. 86.—Chapter 86 of the Gen-
eral Laws of 1876, entitled "An act to regulate the storage of grain,"
(Gen. St. 1878, *c.* 124, §§ 13-20,) applies only to cases where there has
been a delivery of grain by an actual depositor, and not to a case where
a party issues to his creditor an instrument in the form of a warehouse
receipt, for the purpose of pledging or mortgaging his own property in
his own possession to secure his own debt.

One John M. Cole, a miller, of Rochester in this state, having died
intestate, the plaintiffs were appointed his administrators. The de-
fendants G. W. Van Dusen & Co., (a corporation,) Cornelius Finn,
the First National Bank of Winona, and the Second National Bank
of Winona alleged claims to the wheat that was in Cole's mill at the
time of his death. These claims were disputed by the administrators,
and by agreement between the parties the wheat was sold and the
proceeds held by the administrator as a separate fund, subject to all
claims of defendants as if no sale had been made. The plaintiffs
then brought this action in the district court for Olmsted county, pray-
ing to determine the rights of all parties in the fund. The action was
tried by *Start,* J., who found the following facts:

From a date prior to January 1, 1879, to August 21, 1883, John
M. Cole was a miller engaged in operating a flouring-mill at Roches-
ter, and engaged in buying wheat in Minnesota and Dakota, and
manufacturing it into flour, which he shipped and sold to and in such
markets as he found most to his advantage. He used in his mill an
average of 400 to 500 bushels daily. He was not during any part
of this time a general warehouseman, nor had he any warehouse, ex-
cept an elevator which was part of his mill. His principal and ex-
clusive business was that of a miller, though as an incident to this
business, he was accustomed to receive wheat into his mill from farm-
ers, for storage until such time as they should wish to sell it, issuing
to them the usual storage or warehouse tickets or receipts. In 1880,

twenty-five different persons thus stored wheat with him; in 1881, twenty-one; in 1882, four; in 1883, two, one of them being defendant Finn. During those years, however, he received all the good milling wheat offered him for storage, but never sold, delivered or shipped any wheat out of his mill, or redelivered any wheat left with him for storage; all wheat received into his mill, from all sources, (except that on hand at the time of his death,) was ground into flour in the mill.

On the evening of August 21, 1883, Cole was instantly killed by a tornado which also unroofed his mill and greatly injured it. He died intestate and his estate is insolvent. When he became insolvent does not appear, nor is there any question made that he was insolvent prior to his death.

On April 10, 1882, Cole borrowed from the defendant the First National Bank $5,000, upon his promissory note of that date, which was renewed from time to time until July 4, 1883, when he replaced it by his ninety-day note for the same sum with interest, which remains wholly unpaid. When making the loan to Cole, and as collateral security therefor, the bank took from him the following instrument:

"(5,000 bu.)                         ROCHESTER, April 10, 1882.

"Received in store for account of First National Bank of Winona, Minn., five thousand bushels No. 2 wheat, deliverable to them or their order on return of this receipt: provided always that if a certain note, bearing even date, and due July 9, 1882, for five thousand dollars shall have been paid, this receipt is null and void; otherwise to be in full force.

                                   "JOHN M. COLE."

On May 29, 1882, Cole borrowed from the defendant the Second National Bank $3,000, upon his promissory note of that date, which was replaced on May 28, 1883, by his three-months note for the same sum with interest which remains wholly unpaid. When making the loan, and as collateral security therefor, the bank took from Cole the following instrument:
v.33m—8

"ROCHESTER, MINN., May 29, 1882.

"Received in store from the Second National Bank of Winona, for account of themselves, five thousand bushels No. 2 wheat, and deliverable on return of this receipt.

"5,000 bush.                                 JOHN M. COLE."

After plaintiff's appointment as administrator, the bank made due demand on him for the 5,000 bushels of wheat, which was refused.

Except as above stated, Cole never sold any wheat to either bank, and neither bank ever stored any wheat with him, or ever delivered any wheat to him, or ever had any wheat in his possession.

Between August 2d and 8th, 1883, the mill was entirely cleared of wheat, there being on the last-named day no wheat of any kind in the mill that had been placed therein at any time prior to that date, the whole thereof having been ground into flour in the usual course of operating the mill. From a time anterior to the loans by the banks until his death Cole used all wheat received into his mill as a part of his current stock of wheat in his business of milling, and was daily grinding it into flour when the mill was running.

Between June 16th and July 14th, 1883, the defendant Finn stored (subject to advances and storage) with Cole 573 and 50-60 bushels of No. 2 wheat, of which he was then the owner, and received the usual storage tickets therefor. Cole advanced to him on the wheat $25, and the storage charges thereon are $15. On September 12, 1883, Finn made due demand on plaintiff for the wheat, which was worth 86 cents a bushel.

On August 10, 1883, the defendant G. W. Van Dusen & Co. sold to Cole all the milling wheat it then had in its warehouses along the lines of railway in Minnesota and Dakota operated by the Chicago & Northwestern Railway Company, (being in all about 12,000 bushels,) which wheat was bought by Cole to manufacture into flour at his mill.

By the terms of the sale the wheat was not sold on credit, but for cash, and was to be delivered to Cole at the mill and paid for, at the agreed price per bushel, in car-load lots as it should arrive from the several warehouses. Pursuant to the sale, Van Dusen & Co., between August 15th and 21st, 1883, inclusive, delivered to Cole at the mill

7,165 and 20-60 bushels of wheat in car-load lots as it arrived from the warehouses in due course of transportation, at the times and in the quantities, and which wheat was of the grade and price, set forth in schedules annexed to Van Dusen & Co.'s answer. All the wheat so delivered to Cole was delivered to him absolutely, without insisting upon payment of the price at the time of delivery, no conditions, express or implied, being annexed to the delivery. The wheat so delivered comprised 3,566 bushels of No. 1, and 3,599 and 20-60 bushels of No. 2.

At the time of the sale and delivery of the wheat, Van Dusen & Co. had no knowledge that Cole had executed the receipts to the banks, nor any knowledge or reason to believe that Cole was insolvent. No part of the wheat has been paid for. Due demand of the wheat was made on the plaintiffs and refused.

Other wheat included in the sale was in transit at the time of Cole's death, and was stopped and retaken by Van Duzen & Co. after his death.

During the time that the wheat bought of Van Dusen & Co. was being delivered, the mill was in operation, and Cole also received into it from other sources 3,286 and 50-60 bushels of wheat, all of which, except 565 and 35-60 bushels, was No. 2 wheat. All wheat of the same grade received during this time was elevated into the same bin.

After Cole's death, and when plaintiffs took possession of the mill, they found in it 3,120 and 31-60 bushels of No. 1 wheat, and 3,089 and 18-60 bushels of No. 2 wheat, the No. 1 wheat being part of the No. 1 wheat sold and delivered to Cole by Van Dusen & Co.

After Cole's death, all the defendants having made their claims to the wheat in plaintiffs' possession, it was agreed by all parties that the plaintiffs should sell the wheat, and hold the proceeds as a separate fund in place of the wheat, and that the rights of all parties (if any they had) to the wheat should attach to the fund. Thereupon the plaintiffs sold the No. 1 wheat for $3,120.50, and the No. 2 wheat for $2,648.16, and hold the proceeds ($5,768.66) under the agreement.

As conclusions of law the court held that Finn was entitled to receive the value of his wheat less the $40 due for storage and advances, and that none of the other defendants had any claim on the wheat or

fund, but that all of it (subject to Finn's claim) belonged to plaintiffs as administrators. Judgment was ordered and entered accordingly, and Van Dusen & Co. and the banks appeal.

*Chas. C. Willson*, for G. W. Van Dusen & Co., appellant.

*Thos. Wilson* and *Lloyd Barber*, for the Banks, appellants.

*A. L. Gove*, for respondents.

MITCHELL, J. When nothing is said in a contract for the sale of goods as to the time of payment, the law presumes that the sale is for cash. Upon a sale for cash, payment and delivery are concurrent and mutually-dependent acts. Neither party is bound to perform without contemporaneous performance by the other. Where payment of the purchase-money, or giving security for its payment, and the delivery of the goods, are expressly or impliedly agreed to be simultaneous, and the payment or security is omitted, evaded, or refused by the purchaser upon getting possession of the goods, the seller may immediately reclaim them; the title in such case not passing to the purchaser, the delivery being merely conditional, and the purchaser taking simply as trustee for the seller until the condition is performed. But where there is a condition made at the contract of sale favorable to the vendor, and solely for his benefit, he may, if he choose, waive it. Hence a conditional sale may become an absolute one by an unconditional delivery of the goods to the purchaser. By an unconditional delivery the title to the goods passes to the vendee. A cash sale is not necessarily a conditional sale. It is as competent for the vendor to waive the condition of payment concurrently with delivery, as any other condition in his favor. *Scudder* v. *Bradbury*, 106 Mass. 422. To constitute a conditional delivery, it is not necessary that the vendor should declare the conditions in express terms at the time of the delivery. It is sufficient if the intent of the parties that the delivery is conditional can be inferred from their acts and the circumstances of the case. Hence, after a conditional sale has been made, and a delivery has taken place upon the expectation that the purchase-money will be shortly paid, or the contemplated security given, the delivery would ordinarily be conditional without any express declaration to that effect, because there is an implied understanding that the vendee will act honestly, and that he takes the goods

subject to the contract. Therefore a sale does not, *ipso facto,* become absolute when a delivery is made, unaccompanied by any express declaration that it is conditional. Any such rule would be unreasonable, and greatly embarrass sales. 2 Kent, \*497; *Leven* v. *Smith,* 1 Denio, 571; *Smith* v. *Dennie,* 6 Pick. 262.

But the doctrine is uniform and well established that if the vendor unqualifiedly and unconditionally delivers the goods to the vendee without insisting on performance of conditions, intending to rely solely on the personal responsibility of the vendee, the title passes to the latter, and the vendor cannot afterwards reclaim the property, even if the condition is never performed. His only remedy is upon the contract for the purchase-money. 2 Kent, \*496; Benj. Sales. § 320, note *d; Carleton* v. *Sumner,* 4 Pick. 516; *Smith* v. *Dennie, supra; Dresser Manuf'g Co.* v. *Waterston,* 3 Met. 9; *Farlow* v. *Ellis,* 15 Gray, 229; *Goodwin* v. *Boston & L. R. Co.,* 111 Mass. 487; *Scudder* v. *Bradbury,* 106 Mass. 422; *Haskins* v. *Warren,* 115 Mass. 514; *Freeman* v. *Nichols,* 116 Mass. 309; *Bowen* v. *Burk,* 13 Pa. St. 146; *Mixer* v. *Cook,* 31 Me. 340.

The weight of authority seems to be that a delivery, *apparently* unrestricted and unconditional, of goods sold for cash, is presumptive evidence of the waiver of the condition that payment should be made on delivery in order to vest the title in the purchaser. *Scudder* v. *Bradbury,* 106 Mass. 422; *Upton* v. *Sturbridge Cotton Mills,* 111 Mass. 446; *Hammett* v. *Linneman,* 48 N. Y. 399; *Smith* v. *Lynes,* 5 N. Y. 41; *Farlow* v. *Ellis, supra.* No secret or undisclosed intent of the seller is of itself sufficient to make the delivery conditional. This is not enough to make the purchaser a trustee of the vendor. *Upton* v. *Sturbridge Cotton Mills, supra.* Waiver is a voluntary relinquishment of some right, which, but for such waiver, the party would have enjoyed. Hence voluntary choice is of the essence of waiver, and not mere negligence, though from such negligence, unexplained, such intention may be inferred. Hence the important question, in determining whether there has been a waiver of a condition of sale, is: Has the vendor manifested, by his language or conduct, an intention or willingness to waive the condition, and make the delivery unconditional and the sale absolute, without having received payment or

the performance of the conditions of sale? This must depend on the intent of the parties at the time, to be ascertained from their conduct and language, and not from the mere fact of delivery alone. Whether there has been a waiver is a question of fact. It may be proved by various species of evidence: by declarations, by acts, or by forbearance to act. But, however proved, the question is: Has the vendor voluntarily and unconditionally delivered the goods without intending to claim the benefit of the condition? *Fuller* v. *Bean,* 34 N. H. 290–303; *Smith* v. *Dennie, supra; Farlow* v. *Ellis, supra; Hammett* v. *Linneman, supra.*

In the case at bar the court has found that the sale by Van Dusen & Co. to Cole was for cash; but he also finds that all the wheat delivered to Cole was so delivered to him *absolutely,* without insisting upon payment at the time of delivery, *no condition, expressed or implied, being annexed to the delivery.* If this is justified by the evidence, it is, under the rules of law already announced, conclusive against the right of Van Dusen & Co. to reclaim the wheat because of non-payment of the purchase-money.

We shall not attempt to state the evidence. The substance of it is very fairly and succinctly stated in the findings of fact by the trial court.

The contract between the parties not having been in writing, and Cole being dead, the evidence was, necessarily, mostly circumstantial, consisting largely of facts showing the course of dealing between the parties in reference to this and numerous other prior and similar transactions. Payment had never been insisted upon at the time of delivery. The delivery of grain in this, as well as former deals, was apparently unrestricted and unconditional; at least, it was never accompanied by any express declaration that it was conditional. According to the usual course of dealing between the parties, it appears that while Van Dusen & Co. were accustomed to send Cole their bills from time to time, as one or more car-loads were delivered, yet immediate payment was never insisted upon—Cole paying in whole or in part, from time to time, as was convenient; sometimes within a day or two, sometimes not for weeks or even months after the delivery of the grain.

The evidence shows that Cole bought wheat exclusively to be ground

in his mill. It also tends to show that he never kept it separate from other wheat until paid for, and that he was accustomed to use it by grinding it up at any time after delivery, without reference to whether he had paid for it or not. From the situation of the parties it is almost impossible that Van Dusen & Co. were not fully aware of this mode of dealing with the wheat by Cole. In fact, the evidence tends strongly to prove that they perfectly understood it. Cole's standing was good, and it appears that Van Dusen & Co. had entire confidence in his personal responsibility. Such a state of facts amply sustains the finding of the court to the effect that the delivery of the grain to Cole was absolute and unconditional, and was intended to be such, and that Van Dusen & Co. had no expectation of asserting the condition of payment before the title should pass, but, on the contrary, relied solely upon the vendee's personal responsibility.

Van Dusen & Co. also contend earnestly that the sale and delivery of the whole 12,000 bushels was an entirety, and the payment also to be an entirety upon the delivery of the whole, and therefore that the delivery was not complete when Cole died, and hence there could have been no waiver of conditions as to the part delivered. This theory of the transaction is entirely at variance with the course of dealing between the parties, both in reference to this and prior sales. While it is true that the bargain for the purchase of the 12,000 bushels was a single contract, yet it was evidently the understanding of the parties that it was to be delivered in instalments of one or more car-loads, the purchase-money for which was payable at any time on demand after delivery, without reference to whether the whole amount contracted for had or had not been delivered. It was precisely on this theory that Van Dusen & Co. acted in reference to this very transaction, for, if their present theory be correct, there was nothing due until the whole 12,000 bushels was delivered. The grain being thus deliverable and to be paid for in instalments, the delivery of each instalment was just as complete as if no more remained to be delivered. The evidence fully warranted the court in finding that the wheat was to be delivered and paid for in car-load lots, as it should arrive from the several warehouses of the vendors. And this finding is fairly within the issues made by the pleadings.

2. This brings us to the consideration of the claims of the defendant banks. The facts as found by the court are as follows: Cole was a miller operating a flouring-mill, and engaged in purchasing wheat and manufacturing it into flour, and shipping and selling the same. He was not a general warehouseman, and had no warehouse except an elevator, which was a part of his mill. His principal and exclusive business was that of miller, although, as an incident to that business, he was accustomed to receive into his mill from farmers, for storage, wheat, until such time as they desired to sell it, issuing to them therefor the usual storage or warehouse tickets. In 1880 twenty-five persons so stored wheat with him; in 1881, twenty-one; in 1882, four; in 1883, two. He never sold, delivered, or shipped wheat out of his mill, or redelivered any wheat left with him for storage, but all wheat thus received into his mill he ground up, using it as a part of his current stock in his business of milling. In April, 1882, he borrowed $5,000 from the First National Bank of Winona, for which he gave his note, and at the same time executed and delivered to the bank the following instrument: "Received in store, for account of First National Bank of Winona, 5,000 bushels of No. 2 wheat, deliverable to them or their order on return of this receipt: provided, always, that if a certain note, bearing even date, and due July 9, 1882, for $5,000, shall have been paid, this receipt is null and void, otherwise in full force." In May, 1882, he had a precisely similar transaction with the Second National Bank, except that the loan was $3,000 and the instrument in the form of a receipt which he gave, did not contain the proviso contained in the other. Neither loan was ever paid. These instruments were, and by all parties were intended to be, collateral security for the repayment of these loans, and for no other purpose. Otherwise than as above stated, Cole never sold any wheat to these banks, nor did the banks ever store any wheat with him, or ever deliver any wheat to him, and never had any wheat in his possession. Between August 2d and 8th, 1883, the mill was entirely cleared out of wheat, so that on the 8th of August there was no wheat of any kind in the mill that had been placed there prior to that date, the whole having been ground into flour in the usual course of operating the mill.

The court does not find, and there was no evidence tending to prove, that there was any wheat in the mill at the date of either of these transactions with the banks. The wheat found in the mill at Cole's death, which is the wheat here in controversy, was purchased by him from defendants Van Dusen & Co., and others, subsequent to August 8, 1883.

It seems to us that to state these facts is to prove that the banks cannot maintain their claim to this wheat. The act of 1876, commonly known as the "Warehouse Act," (Laws 1876, *c.* 86; Gen. St. 1878, *c.* 124, §§ 13–20,) has no application to such transactions. The banks never actually delivered any wheat to Cole for storage. They never bought any wheat of him, and he never sold them any. All that can be possibly claimed is that he executed these receipts for the purpose of pledging or mortgaging his own wheat to the banks as security for his own debt. Now the act above cited, as its title and contents clearly indicate, was designed to protect the rights of actual depositors—those who deliver grain to another for storage. The act is too long to quote *in extenso*, but its language throughout shows that this was its exclusive scope and purpose. The very first expression in the first section furnishes the key to the whole act, viz.: "Whenever any grain shall be delivered for storage." Such expressions as "whenever any grain shall be deposited," "the person so storing," "the amount of grain so stored," "the terms of storage," "charges for storage," and like expressions, are to be found all through the act. But aside from the strict letter of the act, its provisions as a whole, the evil sought to be removed, and the remedy sought to be applied, clearly show that it was never in the legislative mind that it should apply to transactions where there was in fact no deposit of grain for storage, but simply an attempt by a party to pledge or mortgage his own property in his own possession to secure his own debt. To extend its application to such transactions would practically result in important modifications of the law of pledges and mortgages of personal property,—a thing not to be presumed to have been contemplated by the legislature. We do not mean to say that a vendor may not become the bailee of the vendee, so as to bring the transaction within the statute. It might with force be claimed that there would

be no substantial reason for requiring the parties in such a case to go through two ceremonial deliveries. But that is not this case. To bring a case within the provisions of this statute, there must be a delivery by an actual depositor. See *Greenleaf* v. *Dows*, 8 Fed. Rep. 550; *Adams* v. *Merchants' Nat. Bank*, 2 Fed. Rep. 174.

Therefore, in our judgment, this statute has no application to the present case, and hence the rights of the banks must be determined according to common-law principles alone. If these transactions amounted to anything, it was either as a pledge or a mortgage. For the purposes of this case it is immaterial which it be called. One of the counsel for the banks avoids stating which of the two he claims it to be. The attorney of record claims it was a pledge. We are inclined to think it was an attempt to create a pledge; and as that is the view most favorable to the banks, we shall consider the case from that stand-point.

We shall assume (without deciding the question) that a *warehouseman*, having property of his own in his warehouse, may pledge it as security for his own debt by merely issuing to his creditor an instrument in the form of a warehouse receipt. This is, certainly, as far as any authority goes. We will also assume that Cole was, within the meaning of the authorities, a "warehouseman," which we very much doubt. But, conceding these, still there never was any executed contract of pledge, because no specific property was ever appropriated to the contract so as to pass title to the pledgee.

It is an elementary principle of law, applicable alike to sales, mortgages, and pledges, that the contract becomes executed only by specifying the goods to which it is to attach; or, in legal phrase, by the *appropriation* of the specific goods to the contract. Until this is done the contract is executory, and the property does not pass. There was no such appropriation of any specific grain to these contracts, even under what may be termed the modern American doctrine, that, where the mass, from which the sale, mortgage, or pledge is made, is uniform in character and quality, as wheat in an elevator, separation from the mass is not necessary to constitute an appropriation of the property to the contract. But in this case, out of what mass was this wheat to be taken? There is no evidence that there was any wheat.

in the mill when these receipts were executed, and, if there was, there is nothing to show that it was the wheat referred to. So far as appears, the banks might with equal propriety claim any other wheat situated elsewhere. But even if it be further conceded that there was, at the dates referred to, wheat in the mill, and that this was the wheat referred to in the receipts, yet there is still a conclusive reason why the banks cannot recover. As found by the court, Cole was accustomed to use all the wheat in his mill as a part of his stock in the milling business, grinding it into flour, which he shipped and sold. This appears to have been his usual and long-continued practice. In view of this fact, and also the well-understood usages of the grain trade as to the time within which it is ordinarily marketed, it could never have been in the contemplation of the parties that Cole would keep this wheat on hand from the spring of 1882 until the late summer of 1883. The banks must have understood that Cole would, and tacitly assented that he might, use and grind up this wheat, and ship and sell the flour. The most that can be claimed for the transaction is that he was, on demand, to deliver to the banks out of his stock an amount of wheat corresponding in quantity and grade to that named in the receipts. Even if they had actually deposited their own wheat with Cole, under such circumstances, it hardly needs the citation of authorities at this day to the proposition that it would have, in the absence of a statute, constituted a sale and not a bailment. The very object of the statute already considered was to change the rule in this regard as to actual depositors. See *Rahilly* v. *Wilson*, 3 Dill. 420; *Chase* v. *Washburn*, 1 Ohio St. 244; *South Australian Ins. Co.* v. *Randell*, L. R. 3 P. C. App. 101.

No case to which we have been referred goes far enough to support the claim of the banks on the facts of this case. In almost all of them we think it will be found that not only was specific property appropriated to the contract, but the identity of the subject of the the pledge was preserved. *Merchants', etc., Bank* v. *Hibbard*, 48 Mich. 118, which takes quite advanced positions on some questions, comes nearer supporting the claim of the defendants than any case we have found. But the identity of the property pledged with that claimed seems to have been assumed or taken for granted. On no other

theory, we think, could the result in that case have been reached. In the case at bar, all wheat in the mill had been removed between August 2d and 8th, and the wheat in dispute purchased by Cole subsequent to the latter date.

Our conclusion is that the banks have no title to the wheat, and have no right to any preferences over other creditors of the estate in the distribution of its proceeds.

Judgment affirmed.