## JOHN RADLOFF v. GEORGE BRAGMUS AND ANOTHER.[1]

January 2, 1943.

No. 33,269.

*Dailey, Mason & Mason,* for appellant.

*Arthur J. Phil Jelinek* and *Eugene E. Komarek,* for respondents.

*Lauerman & Pfeiffer* and *Edwin C. Kraus,* filed a brief *amici curiae* in behalf of the contention of appellant.

[1]Reported in 7 N. W. (2d) 491.

JULIUS J. OLSON, JUSTICE.

Action to recover the balance of the purchase price of a flock of turkeys claimed by plaintiff to have been sold to defendants on November 9, 1940. When plaintiff rested, defendants' motion to dismiss was granted because, in the court's opinion, he had failed to make a *prima facie* case. He appeals from an order denying his motion for a new trial.

There is very little of dispute in the evidence. Viewing it in the light most favorable to plaintiff, the jury could have found these to be the facts: Over a period of some years plaintiff has been engaged in the business of raising and selling turkeys. Defendant Bragmus is the managing agent of defendant New Prague Produce Company, which is engaged in the business of buying and processing poultry. On the day mentioned plaintiff met Bragmus at Mapleton, and there they engaged in negotiations for a sale of plaintiff's turkeys consisting of a flock of "about" 100 turkey hens and 600 Toms. After oral negotiations had reached the point of mutual assent, an instrument in writing was prepared by Mr. Bragmus reading as follows (omitting date, address, and signatures):

"This confirms my sale to you of the following:
About 100 Head Number 1 Hen Turkeys at 18⅝¢ per pound.
About 600 Head Number 1 Tom Turkeys at 13⅝¢ per pound.
The Number 2's to be 3¢ less in each case.
Removal to be made Nov. 13, 1940.
Receipt of $50.00 is hereby acknowledged."

This instrument was signed by plaintiff, and Mr. Bragmus in behalf of his company accepted it in that form. At the bottom of the instrument appear these words in the handwriting of Mr. Bragmus: "Out for sure on this date." In explanation of what was meant thereby, there is testimony that this referred to the removal date mentioned in the body of the written agreement. The reason why plaintiff wanted the removal date fixed was that he was to go deer hunting and he wanted the turkeys removed

not later than the mentioned date. The turkeys were "supposed to be picked up" by defendants. "He [Bragmus] was supposed to remove them all."

The cash payment was in the form of a $50 check signed and delivered by Bragmus for his company. He wanted the written contract so "that he would know he would have the turkeys when he came to get them." On the check stub delivered to plaintiff, also in the handwriting of Mr. Bragmus, there appeared this significant language: "Turkey purchase."

On November 11 occurred the blizzard which brought tragedy to a large section of this part of the country. Some 330 of the turkeys here involved were destroyed, and those not destroyed were damaged. It is not claimed that the loss was one for which either party is to be blamed.

As soon as the storm abated so that plaintiff could get to town, he went to the office of the produce company and demanded of Bragmus that the turkeys bargained for be taken. This demand being refused, plaintiff disposed of the live birds at a loss. The dead birds were sold to a rendering concern at four dollars per ton. The difference between the price fixed by the contract and the salvage obtained later from the sale of the remaining birds, both live and dead, as has been related, is the basis for the present action. It is therefore apparent that the question here for decision is whether the title to them passed from plaintiff to defendants on November 9. The court was of the opinion that title had not passed and for that reason dismissed the action. Counsel are in agreement that this is the decisive issue.

The issues as presented by defendants' answer are enlightening. Therein they (paragraph 2)—

*"Admit* that defendant George *Bragmus, agreed on November 9, 1940, to purchase from plaintiff for* the defendant, *The New Prague Produce Company,* a corporation, *about 100 number one live hen turkeys* at the price of 18½¢ per pound, *and about 600 number one live tom turkeys* at the price of 13½¢ per pound, *and further admit that the removal of said turkeys by defendants* and the deliv-

ery thereof by plaintiff *was to be made by November 13, 1940,* subject to selection, grading and weighing of the same by both plaintiff and defendants." They further alleged that the parties "agreed * * * that after selection, grading, weighing, and delivery of said turkeys by plaintiff to defendants, and after the purchase price thereof was ascertained, defendants agreed to pay plaintiff therefor in full." (Italics supplied.)

In the next paragraph they plead the occurrence of the November 11 snowstorm and say:

"That plaintiff's loss was due to inevitable and unavoidable accident, and due to no fault or negligence" on their part. As a consequence, so they continue (paragraph 4), "on November 13, 1940, plaintiff was unable to furnish or deliver to defendants any number one of *live* hen turkeys or number one *live* tom turkeys, suitable for grading, and suitable for dressing, packing and resale by defendants for public use to conform with the laws of this State under which they operate." Therefore, they ask for a refund of the $50 paid at the time of the making of the contract which we have quoted. "For a separate defense" (paragraph 5) they allege that there was such "lack of agreement by plaintiff and defendants as to number, grade and weight of turkeys to be taken, and the price to be paid therefor," as thereby to create "such an indefiniteness and uncertainty in their said agreement [as] to make it unenforceable by plaintiff or defendants." (Italics supplied.)

At the time of the making of the written agreement the jury could well find that the turkeys were in deliverable condition and that they represented plaintiff's entire flock. True, the turkeys had not been weighed or graded. But there is testimony that at least 95 percent of them would grade No. 1 and that not to exceed five percent would grade No. 2, both such grades being specifically covered by the written contract. Also, there is evidence from which the jury could find their fair average weight. Certainly there is no doubt that the exact weight of the turkeys killed in the storm and sold to the rendering plant was three tons. As to

those not killed but sold later as live birds, it should not have been particularly difficult for a jury to ascertain their weight shortly after the storm. Plaintiff's testimony is that they lost weight because of the storm. If that was so, the extent of the loss on that account was also a jury question.

Our uniform sales act provides, Minn. St. 1941, § 512.18 (Mason St. 1927, § 8393):

"(1) Where there is a contract to sell a specific or ascertained goods, the property in them is transferred to the buyer at such time as the parties to the contract intend it to be transferred.

"(2) For the purpose of ascertaining the intention of the parties, regard shall be had to the terms of the contract, the conduct of the parties, usages of trade and the circumstances of the case."

*Id.* § 512.19 (§ 8394), provides:

"Unless a different intention appears, the following are rules for ascertaining the intention of the parties as to the time at which the property in the goods is to pass to the buyer.

"Rule 1. Where there is an unconditional contract to sell specific goods, *in a deliverable state,* the property in the goods passes to the buyer when the contract is made and it is immaterial whether the time of payment, or the time of delivery, or both, be postponed.

"Rule 2. Where there is a contract to sell specific goods and the seller is bound to do something to the goods, *for the purpose of putting them into a deliverable state,* the property does not pass until such thing be done." (Italics supplied.)

*Id.* § 512.42 (§ 8416), provides:

"Unless otherwise agreed, delivery of the goods and payment of the price are concurrent conditions; that is to say, the seller must be ready and willing to give possession of the goods to the buyer in exchange for the price and the buyer must be ready and willing to pay the price in exchange for possession of the goods."

The statutory rules above quoted are in substance what this court defined them to be in Day v. Gravel, 72 Minn. 159, 162, 75 N. W. 1, 2:

"Where there is an unconditional contract for the sale of specific goods, in a deliverable state, the property, unless a different intention appears, passes to the buyer when the contract is made, and it is immaterial whether the time of payment or the time of delivery, or both, be postponed." But, "where there is a contract for the sale of specific goods, and the seller is bound to do something to the goods *for the purpose of putting them into a deliverable state,* the property does not pass until such thing be done." (Italics supplied.)

Our cases are cited in 5 Dunnell, Dig. & Supp. § 8511, under notes 14 to 18, inclusive.

It will thus be seen that long prior to our adoption of the uniform sales act our decision law had paved the way for what the act now provides.

We have here a simply worded contract, easily understood, which was prepared by defendants for use in their everyday business transactions. We can see nothing ambiguous about it. Plainly, by its terms, there was an immediate transfer of title to the buyer. In plain language, selected and used by defendants, they confirmed the sale made to them that day by plaintiff. Upon the strength of it they paid $50 as a part of the purchase money. Defendants concede as much by their answer. They were to take the turkeys at plaintiff's farm not later than the 13th. That the turkeys were "in a deliverable state" on November 9 is not denied. There was nothing further for plaintiff to do "for the purpose of putting them into a deliverable state." The counting, weighing, and grading of the turkeys were purely matters of routine and of simple computation, as much so as if so many steers had been involved to be paid for at so much per pound.

In respect to grading, a matter considered by the trial judge as presenting considerable difficulty because of the possibility of a

dispute over it between the parties, we think this furnishes no more opportunity for disagreement than counting or weighing. After all, grading of poultry is as well defined and established by rules and regulations as is grading of grains, hay, eggs, and many other farm products. By L. 1931, c. 394, § 7, Minn. St. 1941, § 27.07 (Mason St. 1940 Supp. § 6240-18½f), the commissioner of agriculture, dairy and food is given "power to establish grades on all produce" as therein defined. And by § 2 *Id.*, § 27.01, subd. 2 (§ 6240-18½a), "produce" as used in this act shall mean and include "poultry and poultry products." The commissioner, instead of making and promulgating such rules, has adopted and made operative those of the Federal Agricultural Marketing Administration, effective since July 1940.

Furthermore, defendants cannot deny that they had knowledge of such rules and regulations, for in their answer they say that "plaintiff was unable to furnish or deliver to defendants any * * * turkeys, suitable for grading, and suitable for dressing, packing and resale by defendants for public use to conform with the laws of this State under which they operate."

We think the court erred when it dismissed plaintiff's cause and that it repeated the error in denying his motion for a new trial. Because defendants' attempt to alter the written memorandum by means of the allegations of their answer would have amounted to a complete change of that which was written, absent any effort to have it reformed, and because there was no suggestion of inadvertence, mutual mistake, fraud, or overreaching by any party to the contract, it must stand as made.

Order reversed.

PETERSON, JUSTICE (concurring specially).

The written memorandum is, to say the least, rather incomplete. It does not *specify* or *identify* the particular turkeys sold. True, it specifies the quantity and quality of the turkeys sold, but that is entirely different from specifying the particular turkeys which were to be the subject matter of the sale. Nor is there any other identification thereof. The memorandum does not show where the

turkeys were, much less that they were the flock which plaintiff had on his farm. It would be impossible to identify the turkeys sold by the terms of the memorandum. It contemplated that defendants should first inspect the turkeys as to quality and that they should not be the subject matter of the sale unless they were of the quality specified in the memorandum. For that reason, the particular turkeys which were the subject of sale under the contract depended on defendants' determination of quality at the time of removal, an act to be performed in the future. Of course, title may pass where there is a sale of *specific* goods, although the price is to be paid and delivery is to be made in the future. This evidently is the theory of the majority opinion. I find it difficult to find that in the instant case there was a sale of *specific* turkeys. This case is governed by E. L. Welch Co. v. Lahart Elev. Co. 122 Minn. 432, 437, 142 N. W. 828, 830, where we said:

"This was not a sale of specific goods. It was a sale of goods not specified at the time the contract was made. The rules as to sale of specified goods do not fully apply, but they must be borne in mind, for the executory contract is converted into a complete bargain and sale by specifying the goods to which the contract is to attach, or, in legal phrase, by the *appropriation* of specific goods to the contract. The sole element deficient in a perfect sale is thus supplied. The contract has been made in two successive stages, instead of being completed at one time; but it is none the less one contract, namely, a bargain and sale of goods. Benjamin, Sales (7th Am. ed.) § 358; Benjamin, Sales (5th Eng. ed.) 341. In such case the title passes at the time the goods are 'appropriated' to the contract. Fishback v. G. W. Van Dusen & Co. [33 Minn. 111, 22 N. W. 244] supra; Jones v. Schneider, 22 Minn. 279; that is, when the parties do something which signifies an intention that the title shall pass. To constitute an appropriation, the goods must be identified and they must be applied irrevocably to the contract. It is not always easy to determine, in a given case, whether they have been so applied. No particular words or acts are required. The intent of the parties governs."

On the whole record, it seems to me that all we should hold is that whether plaintiff sold his entire flock to defendants and whether the quantities and qualities specified in the memorandum were mere approximations concerning the turkeys sold were fact questions. But we should not hold that the memorandum forecloses defendants on any question. If in fact defendants agreed to purchase turkeys of the specified number and quality to be selected by them from a flock of a larger number, title did not pass under the decision cited.