[Civ. No. 3713. Fourth Dist. May 7, 1948.]

E. H. JOHNSON et al., Respondents, v. ROY BESOYAN et al., Appellants.

Nathan Newby, Jr., for Appellants.

M. C. Chase and J. A. Chase for Respondents.

MARKS, J.—This is an action brought to recover the agreed purchase price of a crop of watermelons which plaintiffs allege were sold to defendants for $2,200 and for which defendants failed and refused to pay. Plaintiffs had judgment for $1,712.90, which is $2,200 less $487.10, the net amount received by plaintiffs for the sale of part of the melons after defendants had refused to harvest them. Plaintiffs also recovered their accrued interest and costs.

Plaintiffs owned 9 acres of watermelons in Tulare County. On July 11, 1945, while E. H. Johnson was watering his cotton, which adjoined the watermelons, defendants approached him about the sale of the melons. Defendants looked over the melon patch twice and then learned that plaintiffs' lowest price for the crop was $2,200. They asked time to consider the purchase, left, and returned in about an hour. They went through the patch again and agreed to pay $2,200 for the crop. Roy Besoyan gave Mr. Johnson a check on a Los Angeles bank for $1,000, on the face of which was written, ''For 9 acre mellon patch. Balance due $1200.00.'' It was understood that before any melons were picked and removed Ed Besoyan would execute a promissory note for $1,200, the balance of the purchase price. Mr. Johnson understood that he was to irrigate the melons during the harvesting period. There was nothing else left for him to do under the agreement of sale.

On July 14th, defendants started picking the crop and picked between 10 and 13 tons. Roy Besoyan had a promissory note for $1,000 payable to E. H. Johnson, signed by Ed Besoyan. He told Johnson that Ed had made a mistake

and made the note for $1,000 instead of $1,200 and that Ed would make another for the proper amount. Johnson again insisted that he must have the note before any melons were hauled away. Johnson returned to his home and defendants continued picking melons. A further conversation occurred later in the same day which Mr. Johnson detailed as follows:

"A. And Ed says, 'You know', he says, 'We've decided we don't want that melon patch.' He said, 'We want to pay you for the damage we've done.' Q. What answer, if any, did you make? A. I says, 'Well, Ed, I don't want that melon patch', I says, 'I've no way to take care of it. I haven't got help. I wouldn't have sold it in the first place if I had means of taking care of it.' I said, 'As far as I'm concerned that's just your melon patch.' 'Well,' he says, 'I'll give you a hundred dollars for what damage we've done.' I says, 'No, I won't take it,' I said, 'That's your melons, not mine.' Ed said, 'Well, only way you'll ever get it is by law.' I said, 'If that's the way I'll have to get it, that's how I'll get it.' They walked off. Then along—it was either that same afternoon or the next morning, Monday morning, that they went somewheres and brought some colored boys back in there and they just cut those melons all the way through."

After defendants had refused to proceed with the harvesting of the crop plaintiffs picked and sold about 18 tons of melons for which they received $670.88 with an expense of $183.78 in harvesting. Payment of the $1,000 check was stopped and this action followed.

There are two questions to be considered on this appeal: (1) Was there a sale of the crop of melons from plaintiffs to defendants so that title passed to them, and, (2) the proper measure of damages.

The trial judge found that the oral contract of sale of July 11, 1945, was consummated on July 14, 1945, by defendants entering into possession of and receiving and accepting all of the melons.

Section 1738 of the Civil Code provides as follows:

"(1) Where there is a contract to sell specific or ascertained goods, the property in them is transferred to the buyer at such time as the parties to the contract intend it to be transferred.

"(2) For the purpose of ascertaining the intention of the parties, regard shall be had to the terms of the contract, the conduct of the parties, usages of trade and the circumstances of the case."

Section 1739 of the same code contains the following:

"Unless a different intention appears, the following are rules for ascertaining the intention of the parties as to the time at which the property in the goods is to pass to the buyer.

"Rule 1.   (*Goods in deliverable state.*)   Where there is an unconditional contract to sell specific goods, in a deliverable state, the property in the goods passes to the buyer when the contract is made, and it is immaterial whether the time of payment, or the time of delivery, or both, be postponed."

In *Gianelli* v. *Globe Grain & Milling Co.*, 48 Cal.App. 103 [191 P. 720], it is said:

"It is not at all likely that, had the contract been intended or understood to be merely executory and its consummation dependent upon delivery of the hay by the sellers to the purchaser, the defendant would have bound itself to pay three-quarters of the purchase price within so short a time after the transaction and before (as we shall later see was true) the place of delivery was designated by the defendant. Referring to the circumstance of the payment down of a large amount of the purchase price of personal property as one shedding some light on the nature of the contract involving a transfer of such property—that is, upon the question whether the contract involves an absolute sale or is only executory—Williston, in his work on 'Sales,' 1909 edition, page 368, says: 'If the buyer pays the price, or a large portion of it, it is evidence not so strong as delivery, but still entitled to great weight, that immediate transfer of the property is intended. . . .' " (See, *Aiello* v. *Sliskovich*, 72 Cal.App.2d 39 [163 P.2d 768].)

In the instant case the trial judge was fully authorized by the evidence to conclude that a present sale of the crop of melons was intended. As in *Brietengross* v. *Theodore Krumm, Inc.*, 35 Cal.App.2d 639 [96 P.2d 370], the purchasers were to come, harvest and remove the crop with nothing to be done by the sellers except to run irrigating water through existing ditches during the harvesting period.

In the instant case the buyers paid by check a considerable portion of the purchase price and agreed to pay the balance by giving a promissory note before any of the melons were hauled away. The most convincing evidence of an intention to pass immediate title is the uncontradicted evidence showing that defendants on July 14, 1945, entered the patch and harvested about 13 tons of melons. If they did not then consider

themselves the owners of the melons they have left unanswered the pertinent question of what they were doing on the property of others harvesting a crop that did not belong to them. They either believed they were the owners of the melons or they were guilty of an unwarranted trespass.

The conclusion that there was a present sale of the crop of melons to defendants rather than an executory contract of sale makes the answer to the other question argued by defendants simple.

Subdivision one of section 1783 of the Civil Code permits the seller to bring an action for the price of the goods against a buyer who neglects to pay for them when title has passed. Section 3302 of the same code provides that ''The detriment caused by the breach of an obligation to pay money only, is deemed to be the amount due by the terms of the obligation, with interest thereon.''

The recovery in this action is governed by the foregoing sections, rather than by the provisions of section 1784 of the Civil Code which defendants now urge are controlling. (*Brietengross* v. *Theodore Krumm, Inc., supra*; *Union Liquors, Inc.* v. *Finkel & Lasarow, Inc.*, 44 Cal.App.2d 706 [113 P.2d 19]; *Tillis* v. *Western Fruit Growers, Inc.*, 44 Cal. App.2d 826 [113 P.2d 267]; *Aiello* v. *Sliskovich, supra*.)

Defendants argue that under the evidence favorable to plaintiffs, which must be accepted as true, 90 per cent of the melons were good and merchantable; that uncontradicted evidence produced by defendants shows that the market during the season was good and the price satisfactory, so, if plaintiffs had completed the harvest of all of the crop instead of only 18 tons, they would have had net receipts of over $3,000 and would have suffered no damage from the failure of defendants to complete their contract but instead would have made a substantial profit. This argument overlooks the nature of the action which was for the unpaid contract price of the crop of melons which was delivered to and owned by defendants. The action is on the contract instead of for damages for its breach.

Defendants also argue that if 90 per cent of the melons were merchantable it is beyond belief that they would have refused to market the crop, they being in the business of buying and selling watermelons in order to profit from such transactions. This argument is evidently made in support of defendants' contention that at least 50 per cent of the

melons were not merchantable and were unfit for market so that they were justified in refusing to accept them.

Plaintiffs' evidence was to the effect that not more than 10 per cent of the melons were unfit for market which is customary in the variety involved. The trial court accepted this evidence as true and we can find no inherent improbability in it so we must take it as true as conflicts in the evidence are settled in the trial court.

During the oral argument defendants cited the cases of *Steelduct Co.* v. *Henger-Seltzer Co.*, 26 Cal.2d 634 [160 P.2d 804], and *Jegen* v. *Berger*, 77 Cal.App.2d 1 [174 P.2d 489], maintaining that under them we must reverse the judgment. A study of those cases discloses such factual differences that they cannot be controlling here. Nothing in either of them conflicts with the conclusions we have reached.

The judgment is affirmed.

Barnard, P. J., and Griffin, J., concurred.

Appellants' petition for a hearing by the Supreme Court was denied July 1, 1948.