JAMES MILBOURNE WHEATLEY v. THE H. & H. POULTRY COMPANY, a corporation of the State of Delaware.

(*September* 12, 1950.)

CAREY, J., sitting.

*Caleb M. Wright* for Plaintiff.

*James M. Tunnell, Jr.,* (of Tunnell and Tunnell) for defendant.

Superior Court for Sussex County, No. 322, Civil Action, 1949.

504

**CAREY, J.:**

The plaintiff contends (a) that title to all the broilers passed to defendant immediately upon the making of the contract and that the risk of loss was thereafter upon the defendant; and (b) that, even though it be found that title had not passed, the death of the broilers was due to negligence of defendant's servants, wherefore defendant is liable in any event.

The question presented as to just when property, or title, passes in these transactions between growers and buyers seems never to have been decided in any reported Delaware case. It is an important one, however, to the people of this State because of the vast number of such transactions here. This may be seen from the fact that in 1949, Delaware, tiny in area and small in population, produced fifty percent more broilers than any other single state. In a business of this magnitude, it is only natural that certain usages of trade have developed to the extent that they must be recognized as binding upon grower and dealer in a given case, in the absence of evidence showing an intent not to be bound in some particular. It must be assumed that the parties contracted with reference to those trade customs unless a contrary intent, express or implied, is shown.

The Uniform Sales Act, Article 2 of Ch. 173, Revised Code of Delaware 1935, demands recognition of usages of trade in determining the question here presented. Code Section 5997 is as follows:

"5997. Sec. 47. Property in Specific Goods Passes When Parties so Intend:—

(1). Where there is a contract to sell specific or ascertained goods, the property in them is transferred to the buyer at such time as the parties to the contract intend it to be transferred.

"(2). For the purpose of ascertaining the intention of the parties, regard shall be had to the terms of the contract, the conduct of the parties, usages of trade and the circumstances of the case."

Code Section 5998 reads in part as follows:

"5998. Section 48. Rules for Ascertaining Intention:—Unless a different intention appears, the following are rules for ascertaining the intention of the parties as to the time at which the property in goods is to pass to the buyer:

"Rule 1. Where there is an unconditional contract to sell specific goods, in a deliverable state, the property in the goods passes to the buyer when the contract is made and it is immaterial whether the time of payment, or the time of delivery, or both, be postponed."

Considerable evidence, most of which was uncontradicted, was produced at the trial concerning usages of trade in the broiler raising industry. What is hereafter said includes my findings in those respects where some conflict of testimony exists. In a typical example, the original agreement is no more explicit than the one made here. That is, the only points usually discussed and expressly agreed upon are the price per pound and the time when delivery is to take place. The price is based on "live weight" which is apparently treated as synonymous with the term "marketable". In every flock there are a small number of unmarketable birds called "knots" or "runts." These either are not taken by the buyer when he removes the flock, or else are made the subject of special agreement after the marketable chickens have been

removed. Removal sometimes commences as much as two weeks or more after the date of the contract and often requires several days time to complete, depending cn the number in the flock.

Delivery is made at the grower's houses. The work of catching, weighing and loading is done by the employees of the buyer in the presence of the seller. Coops are owned by the buyer. While the actual catching, weighing and loading is going on, the seller stays out of the houses. Apparently this is for the reason that a number of chickens are frequently smothered or otherwise killed as a result of and during the catching work and it is customary for the buyer to pay for those so killed. It is not customary, however, for the buyer to pay for any other broilers which die after the making of the contract and before removal has been completed. After the agreement has been made, the seller continues to supply the feed and labor necessary for looking after the chickens until their removal, this expense being offset by the increase in weight of the birds.

■ Intention is the basic test laid down by Code Section 5997; the rules listed in Code Section 5998 are expressly applicable only where no contrary intention appears. In the typical broiler transaction of this kind, because of the recognized trade usages, and notwithstanding that the goods are specific and in a deliverable state when the contract is made, I cannot believe that title is intended to pass with the making of the contract. I conclude that title passes as and when the buyer takes actual physical possession of the broilers, provided no fact or circumstance appears to indicate a different intention.

Although stating on the stand that there was nothing "special" about the deal with the defendant, and further that he was making no claim for any chickens which died between August 26 and August 30, plaintiff contends that there are unusual circumstances in this case which show an intention that title should pass with the making of the contract. He points out that defend-

ant, needing broilers immediately, insisted upon starting their removal at once in spite of the intense heat. He argues that defendant must have realized that plaintiff would not have agreed to this if plaintiff was to bear any risk of loss, for this risk is greater than usual in such weather. The difficulty with this argument is that plaintiff did agree to the immediate removal, although reluctantly and after some argument, without conditioning his consent upon an assumption of risk by the defendant. I find nothing in the circumstances sufficient to differentiate this particular transaction from the ordinary one.

I conclude that title to the 2,000 broilers which died on August 26 had not passed to defendant at the time of their death and that the risk of loss with respect to them was upon the plaintiff. This conclusion is not inconsistent with the cases cited by plaintiff, namely, *Radloff v. Bragmus,* 214 *Minn.* 130, 7 *N. W.* 2d 491; *Breitengross* v. *Theodore Krumm, Inc.,* 35 *Cal. App.* 2d 639, 96 *P.*2d 370; *Kepnes v. Grossman,* 247 *Mass.* 142, 141 *N.E.* 799; *Johnson* v. *Besoyan,* 85 *Cal. App.* 2d 389, 193 *P.* 2d 63. They are distinguishable in that they all involved written agreements using words indicating a present transfer of ownership with no circumstances negativing such intention. Moreover, none of them is based upon settled trade practices.

As to the contention that the death of these chickens was caused by negligence of defendant's employees, without burdening this opinion with a recital of the testimony, it will suffice to say that the evidence on the point is in conflict and that plaintiff has not borne his burden of proving his case by the preponderance of testimony. The evidence fails to satisfy my mind that the death of these chickens was caused by the catching of those taken on August 26 or by any negligence of defendant's servants.

Judgment will be entered for defendant.