COLUMBUS MILK PRODUCERS' COOPERATIVE and another, Appellants, v. DEPARTMENT OF AGRICULTURE and another, Respondents.

*No. 176. Argued October 6, 1970.—Decided November 3, 1970.*
(Also reported in 180 N. W. 2d 617.)

452

454

For the appellants there were briefs by *Harold Jordan, Doherty, Rumble & Butler,* and *Garrett B. Wright,* all of St. Paul, Minnesota, and *Carroll B. Callahan* and *Callahan & Arnold,* all of Columbus, and oral argument by *Mr. Jordan.*

For the respondent State Department of Agriculture the cause was argued by *Theodore L. Priebe,* assistant attorney general, with whom on the brief was *Robert W. Warren,* attorney general.

For the respondent Pure Milk Products Co-operative there was a brief by *George M. St. Peter* and *St. Peter & Hauer*, all of Fond du Lac, and oral argument by *George M. St. Peter*.

HEFFERNAN, J. The claimants proceeded under sec. 100.06 (4), Stats. That subsection provides:

"Any person injured by the breach of any obligation under this section may file with the department a verified proof of claim. Upon receipt of such claim or any other evidence of default . . . . The department may demand, collect and receive from the licensee or the trustee, or from the surety . . . the amount determined to be necessary to satisfy such claims. . . ."

The Department interpreted the purchase and sale of milk as a contract which had been breached by the purchaser. The milk producers contended, and the Department of Agriculture found, that the contract is one that arises by implication by operation of law and is a sale with payment to be made at the competitive price for milk in the area.

Columbus agrees that the contract is one of purchase and sale, but it takes the position that the purchaser is solely the one to make the determination of the price and his only obligation is to act in good faith. The Department's principal finding was that the implied agreement was based upon long-established customs and usages of trade and that this implied agreement obligated Columbus to pay the reasonable market value for the milk purchased on the basis of the competitive prices in the area.

The circuit court concluded that this finding was supported by substantial evidence in the record viewed as a whole. The appellants disagree that the evidence is sufficient to support the findings of the Department and the judgment of the court.

Since our conclusion rests primarily upon the question of whether there was substantial evidence in the record when it is viewed as a whole, that evidence need not be

discussed *in extenso,* particularly when the trial court did an admirable job of synthesizing the evidence and discussing the facts revealed in a lengthy record. There was a great deal of testimony which would support the conclusion that Columbus expressly agreed to pay its grade "B" producers the competitive price paid for milk in the area. The Department, however, chose not to rely on an express agreement but instead found an implied agreement based on long-established customs and usages of the trade. The record is replete with testimony that it was the custom of milk purchasers to pay prices in the range considered competitive.

An accountant for the Department testified, on the basis of wide experience, that milk buyers determine their prices on the basis of the competitive price. There was substantial evidence that the price paid by competitors is a primary factor in determining the prices paid for milk each month, although it is clear, also, that other factors create variances from the competitive price. There was general agreement that producers expect to receive competitive prices; and when they do not expect to receive such prices, they sell their milk elsewhere.

There is substantial evidence in the record to permit the Department's conclusion that there is sufficient regularity in the observance of the practice of paying the competitive price for milk purchased to justify an expectation by producers that they will receive that price unless they are notified in advance to the contrary.

The Administrative Procedures Act sets the standards by which a decision of an administrative agency, such as the Department of Agriculture, must be judged on review. Sec. 227.20 (1), Stats., provides in part:

". . . The court may affirm the decision of the agency, or may reverse or modify it if the substantial rights of the appellant have been prejudiced as a result of the administrative findings, inferences, conclusions or decisions being . . .

"(d) Unsupported by substantial evidence in view of the entire record as submitted."

Sec. 227.20 (2), Stats., provides that "weight shall be accorded the experience, technical competence, and specialized knowledge of the agency."

This court has frequently stated that the test of reasonableness is implicit in the term, "substantial evidence," and that the term, "in view of the entire record as submitted," suggests that the test of reasonableness is to be applied to the record as a whole and not just to the portions of the record supporting the agency's conclusion. *Kenosha Teachers Union v. Wisconsin Employment Relations Comm.* (1968), 39 Wis. 2d 196, 204, 205, 158 N. W. 2d 914; *Copland v. Department of Taxation* (1962), 16 Wis. 2d 543, 554, 114 N. W. 2d 858.

The question here then is whether, upon the entire record, the evidence is such that a "reasonable man, acting reasonably, *might* have reached the decision" that there was an implied agreement that Columbus would pay the competitive price for the milk of the "B" producers. E. Blythe Stason, *"Substantial Evidence" in Administrative Law,* 89 University of Pennsylvania Law Rev. (1941), 1026, 1038, quoted in *Copland v. Department of Taxation, supra,* page 554; *see also*: 4 Davis, *Administrative Law Treatise,* sec. 29.06, pp. 143, 144.

We are satisfied, viewing the record as a whole, that there is sufficient regularity of observance of the practice of paying competitive prices to support the Department's conclusion that a recognized trade custom or usage exists. Although the appellants have attempted to show deviations from that practice, and have shown that less than competitive prices had been paid on occasion, they have failed to show sufficient deviation to counteract the substantial evidence showing a uniform trade usage. In addition, they have failed to indicate that noncompetitive prices were not the result of some special agreement with the producers. Moreover, we bear in mind that the De-

partment of Agriculture is a specialized agency whose expertise in the field of milk marketing goes beyond the four corners of the record. The legislature has pointed out in sec. 227.20 (2), Stats., that "due weight shall be accorded the experience, technical competence, and specialized knowledge of the agency."

An implied contract, such as found to exist between milk purchasers and milk producers, is sanctioned by the Wisconsin law and the Uniform Commercial Code. Sec. 402.204 (1), Stats., provides:

"A contract for sale of goods may be made in any manner sufficient to show agreement, including conduct by both parties which recognizes the existence of such a contract."

An "agreement" is defined in sec. 401.201 (3), Stats., as:

". . . the bargain of the parties in fact as found in their language or by implication from other circumstances including course of dealing or usage of trade or course of performance as provided in this code."

A "usage of trade" is defined in sec. 401.205 (2), Stats., as:

". . . any practice or method of dealing having such regularity of observance in a place, vocation or trade as to justify an expectation that it will be observed with respect to the transaction in question. . . ."

The evidence is sufficient to show a course of dealing with sufficient regularity of observance to lead to the reasonable expectation that it will be observed. The trade usage as found by the Department of Agriculture is the custom of paying the competitive price for milk in the absence of any specific agreement that alters that trade usage.

Columbus also argues that, under the doctrine of *Neith Co-operative Dairy Products Asso. v. National*

*Cheese Producers' Federation* (1935), 217 Wis. 202, 257 N. W. 624, the producers, once having received payment on April 20, 1967, were barred from making a claim against the co-operative for the amount of underpayment because the payment was final and binding on both parties.

We do not so construe *Neith*. In *Neith* it was argued that the payment was merely an advance. The court construed the payment in *Neith* as being final. That determination, however, is irrelevant to the point at issue.

Even if it be assumed that the payment in the instant case was final and not an advance, that would not prevent the producers from claiming that the final payment was below the contract price. The fact that the payment is denominated as a final one does not make it a proper payment in discharging the buyer's obligation under the contract. The purpose of the law is well stated in appellants' brief:

"The security law was enacted to provide farmers with a means of recompense where they have suffered a loss in the milk delivered to the plant."

Obviously, if the appellants' interpretation of the *Neith Case* is correct, the producers could not claim a loss or a default if any payment had been made by the 20th of the following month. This interpretation would do violence to the very purpose of the law as stated by the appellants and is, in addition, contrary to the very basic principles of contract law.

Contrary to appellants' contention, the acceptance of the competitive price as the contract price dictated by trade usage does not deprive the co-operative or a milk purchaser of its prerogative of establishing the price that it will pay for milk. The instant case merely stands for the proposition that, in the event no express price is agreed upon by the contracting parties, an implied con-

tract arises as the result of uniform trade usages. If a milk buyer elects not to be bound by such usages and wishes to set a price based on other factors, he may do so, but he is obligated to first notify his producers. The producer then has the option to sell or not as he may determine. In the instant case Columbus failed to notify its producers that it would no longer be bound by the competitive price. Its producers, therefore, properly continued to rely upon their prior course of dealings with Columbus; and Columbus, in accordance with that course of dealings, was obligated to pay the competitive price.

Columbus also attacks the findings of the Department on the ground that the Department stated that milk was to be delivered to Columbus on "open price terms" and that the price was to be determined "in good faith" by Columbus. The Department in effect made dual findings that not only was there a breach by Columbus of its implied contract to pay the competitive price, but also that the open price terms of sec. 402.305, Stats., apply. Columbus claims, contrary to what we conclude is the substantial weight of the evidence, that there was no implied contract to pay the competitive price and that there was merely an open price contract, with the price to be fixed by Columbus in good faith. Columbus then argues, if this is true, that the price paid by Columbus must be accepted because the Department failed to make a finding that the buyer acted in "bad faith." Columbus contends that the absence of good faith is the equivalent of "misrepresentation, deceit, or untruth." As used in the Uniform Commercial Code, the absence of good faith does not necessarily include the nefarious conduct catalogued by the appellants. The official comments to the Uniform Commercial Code point out that, in reference to sec. 402.305, Stats., "Good faith includes observance of reasonable commercial standards of fair dealing in the trade if the party is a merchant."

Good faith is defined in Farnsworth, *Good Faith Performance and Commercial Reasonableness under the Uniform Commercial Code,* 30 Univ. of Chicago L. Rev. (1963), 666, 669. He points out that the obligation of good faith is:

". . . an implied term of the contract requiring cooperation on the part of one party to the contract so that another party will not be deprived of his reasonable expectations."

It is apparent that the course of practice and trade usage in the sale of milk would lead producers to the reasonable expectation that they would be paid the competitive price. The failure to pay such competitive price without prior notification to the producers is evidence of lack of good faith.

As pointed out above, however, the finding of an implied contract based on consistent and uniform usage is sufficient to support the producers' claim that Columbus had defaulted in its obligation. There is also sufficient evidence to show that, even under the theory argued by the appellants, Columbus violated its duty of good faith in fixing the price.

We are satisfied, from a review of the record as a whole, that the findings of the Department are supported by substantial evidence and that the evidence is sufficient to show that there was an implied contract between Columbus and its producers which obligated Columbus to pay the competitive price in the area. It is undisputed that for the month of March, 1967, it failed to pay such competitive prices.

*By the Court.*—Judgment affirmed.