**GEORGIA POWER COMPANY**

v.

**EAST TENNESSEE FUEL, INC.**

Civ. No. 3–80–120.

United States District Court,
E. D. Tennessee, N. D.

Aug. 6, 1980.

Thomas N. McAdams, Knoxville, Tenn., Amy Z. Gershenfeld, Atlanta, Ga., for plaintiff.

Rebecca Gillen, Knoxville, Tenn., Lewis S. Howard, Knoxville, Tenn., for defendant.

## MEMORANDUM

ROBERT L. TAYLOR, District Judge.

This is a breach of contract case. Plaintiff claims $45,623.49 in penalties by reason of defendant's alleged failure to deliver to plaintiff coal of the proper BTU value as provided for in the contract. The case was referred to a Special Master, who, having heard proof, has recommended that the Court enter judgment in favor of plaintiff for $45,623.49. We sustain the Special Master's recommendation.

The contract provided that defendants would deliver to plaintiff coal of certain guaranteed "as received" BTU value. The parties further agreed that plaintiff would pay a "premium" for coal having a higher BTU value, but had the right to assess a "penalty" for coal delivered with a lower BTU value. Finally, the contract provided that in the event plaintiff failed to sample or analyze any coal, the coal would be deemed to have the guaranteed "as received" value.

■ The Court agrees with the Special Master that the "premium/penalty" provision in the contract is no more than an agreed–upon price–adjustment scheme based on actual BTU value of delivered coal. There is nothing ambiguous, burdensome, harsh, or otherwise unjust in these provisions which could serve to relieve the defendant of its contractual obligation.

Plaintiff claims that its analysis revealed that the coal delivered by defendant had a BTU value below that guaranteed in the contract, and notified defendant of its penalty assessment. Defendant's position, in essence, is that adherence to the sampling and analysis standards recognized by the American Society for Testing and Materials (ASTM standards) is an implied term in the contract; that plaintiff failed strictly to adhere to those standards; and thus that plaintiff is precluded from assessing any penalty.

■ The Special Master found, as a matter of fact, that the ASTM standards were adhered to by plaintiff, save in two respects, and that the evidence showed that neither of these deviations resulted in any prejudice to defendant. He found that plaintiff's methods were reasonable in nature and led to reasonably accurate results. The Special Master held that the only implied term in the contract, in this respect,

was the requirement that plaintiff exercise good faith and commercial reasonableness in its sampling and testing of coal, and found that in view of the reasonableness of the testing procedures, this requirement had been satisfied.

We hold that the Special Master has accurately stated the law and that his findings of fact are supported by substantial evidence in the record. We also sustain, ratify, and adopt the Special Master's conclusions with regard to the price–adjustment provision.

Accordingly, it is ORDERED that the report of the Special Master and the recommendation contained therein, be, and the same hereby are, sustained, ratified, and adopted. It is further ORDERED that judgment enter in favor of plaintiffs in the amount of $45,623.49.

Order Accordingly.

### SPECIAL MASTER'S REPORT

This is a contract action brought to recover $45,623.49 in penalties assessed against the defendant for allegedly delivering coal to plaintiff that did not meet the contract specifications. This matter was referred to the undersigned for trial pursuant to 28 U.S.C. § 636(b)(2) and with the consent of the parties. Trial was conducted on June 19 and 20, 1980. A complete transcription of the testimony has been filed with the clerk.

The defendant contends that the plaintiff is not entitled to recover the penalty because (1) it violated the terms of the contract by not sampling the coal properly that it received from the plaintiff and (2) because the plaintiff's testing procedures which were utilized in assessing the penalties did not comply with recognized, industry–wide standards for the testing of coal.

### I. *Findings of Fact*

1. Plaintiff Georgia Power Company is a public utility corporation which is organized and operated under the laws of the State of Georgia. It is a major supplier of electric service to customers throughout that state. Defendant East Tennessee Fuel, Inc., is a corporation which is organized and operated under the laws of the State of Tennessee and is engaged primarily in the business of brokering coal.

2. On March 11, 1977, the defendant submitted a written bid to the coal procurement agent for Georgia Power Company (Southern Company Services) in which the defendant offered to sell coal to Georgia Power Company. In this bid, the defendant offered to supply the plaintiff with coal which was to have the following quality specifications when received by the plaintiff:

| | | |
|---|---|---|
| BTU/LB. | – | 11,750 guaranteed |
| Moisture | – | 6.0% |
| Ash | – | 14.0% |
| Sulfur | – | 2.5% |

Georgia Power Company accepted this bid and the parties entered into the contract set forth in plaintiff's purchase order No. J–9073 dated April 19, 1977. Exhibit 3.

3. The contract provided for the assessment of a penalty or a premium when there was a departure from the guaranteed "as received" BTU value. This provision in the contract allowed for an adjustment in the contract price to compensate the defendant if it delivered coal exceeding the guaranteed BTU value or to compensate the plaintiff if the coal delivered did not meet the guaranteed BTU value. Exhibit 3. The plaintiff notified the defendant that it was assessing penalties against the defendant based on the alleged failure of the coal shipped under the contract to meet the guaranteed BTU value. The plaintiff claims that it is entitled to recover $45,-623.49 in penalties.

4. The provision in the contract which is central to the dispute herein provides as follows:

Samples will be taken of the coal received on this order and an analysis made in our laboratory to determine moisture, ash, sulfur, and BTU content on an "as received" basis. If, however, due to unusual conditions, Georgia Power Company does not sample or analyze any of the coal received on this order, the "as received" BTU value of the coal received

will be deemed to be the guaranteed "as received" BTU value quoted by seller as indicated herein.

5. The defendant did not inspect the plaintiff's testing facilities or make inquiry as to the type of sampling and testing procedures that were to be conducted by Georgia Power before the defendant entered into the contract in question.

6. On May 13, 1977, East Tennessee Fuel submitted a second written bid to Southern Company Services in which it offered to sell the plaintiff an additional quantity of coal. On the basis of this second bid, the parties extended the term of the contract through June and July, 1977.

7. The coal in question was mined from the Nemo seam in Winfield, Tennessee. The defendant began supplying coal to the plaintiff on April 1, 1977 and continued to supply coal through April, May and June and during the first week of July, 1977. The plaintiff paid the defendant on the 20th and 28th of each month during the term of the contract for coal which had been received and processed prior to those dates. During the months of April through July, 1977, Georgia Power Company paid East Tennessee Fuel a total of $699,951.63 for coal sold under the contract.

8. The plaintiff took samples of the coal using a large auger which was lowered into the railroad cars on which the coal arrived. The plaintiff did not sample each railroad car but rather sampled approximately 65 percent of the carloads of coal that were shipped under the contract. It sampled slightly more than 64% of the total weight of coal it received from the defendant.

9. The coal sampling techniques used by the plaintiff were a reliable means by which to obtain samples of coal. The use of auger sampling is recognized by the American Society for Testing and Materials (ASTM) as an acceptable method of sampling coal and produced samples for analysis which were representative of the coal within a particu-

lar train car. The defendant called a witness who had visited the Yates plant in 1978 in May and who had watched the sampling operation for approximately one and one-half hours. He testified that not all of the samples taken with the auger were taken all the way to the bottom of the train car but rather the auger was lowered six inches to three feet into the car. He also testified that he saw samples being taken in dirty sample jars. The value of his testimony was questionable, however, since he was at the Yates plant for a short period of time and since he was there about a year after the coal in question in this case was sampled. Witnesses in the employ of the plaintiff testified that the sampling done at the Hammond and Yates plants was done in accordance with ASTM standards.[1] There was an elaborate written procedure for sampling single car shipments and several of the plaintiff's witnesses testified that it was adhered to. See Exhibit 8, pp. 7–10.

10. The plaintiff had no obligation under the terms of the contract or otherwise to sample each carload of coal that arrived at its plants. The defendant's own expert, Dr. Kuemmerle, testified that "no less [than] two–thirds as an absolute minimum" of the coal shipped under the contract should have been sampled to get a representative sample. Tr. II, 37. The plaintiff sampled just about this much of the coal in question. See Finding of Fact No. 7. There was evidence that the defendant had a contract with the Tennessee Valley Authority which called for sampling of only 10 percent of the coal shipped. The plaintiff's policy was to sample at least 30 percent of the coal shipped before imposing a penalty or paying a premium. The proof showed that the plaintiff fulfilled its obligation to properly sample the coal in question by taking representative samples of the entire lot of coal shipped over the four–month period.

---

1. The approximate 31,000 tons of coal shipped under the contract in question went to three of Georgia Power's plants–Hammond, Yates and McDonough. No sampling of coal was done at McDonough plant since that plant ordinarily received coal in unit train shipments and it was not set up for sampling single car shipments.

11. The defendant steadfastly maintains that the plaintiff did not obtain a representative sample of the coal shipped under the contract. The defendant is particularly concerned that the recommended number of "increments" (samples) may not have been taken during a given monthly period and therefore contends that it was improper for the plaintiff to assess a monthly penalty based on such alleged inadequate sampling.

It is true that the plaintiff did not take all of the increments that ASTM recommends during one or more of the months in question. This did not destroy the accuracy of its sampling, however, since it did take more than enough increments with respect to the entire lot of coal that was shipped during the four–month period.[2] In assessing the amount of price adjustments to be made for the coal it received from the defendant, the plaintiff used weighted averages of the composite samples it analyzed to determine the coal's BTU value. See Tr. I, 99–136. The frequency with which the plaintiff chose to make the price adjustment, whether once at the completion of the contract or monthly (as it was actually done), made no difference in the amount of price adjustment that was to be made under the contract. Id. at 116, 121–122, 236–240.

12. The evidence showed without contradiction that ASTM standards are recognized in the industry as proper standards for the sampling and testing of coal. Indeed, the plaintiff's own witnesses acknowledged that both its sampling and testing procedures were modeled after the ASTM standards. The preponderance of the evidence disclosed that the plaintiff's testing procedures were done in accordance with ASTM standards, with two exceptions. First, the plaintiff did not use sulfuric acid as a desicator (drying agent) during the initial air drying stage of the sample as recommended by ASTM. This was not done because of the danger to laboratory personnel posed by the use of such acid. If any bias was introduced because of this deviation from the standard, it resulted in a bias in favor of East Tennessee Fuel since the coal tested would appear to have a lower moisture content and a resultant higher BTU value.

Second, the plaintiff used a 10–gram sample to determine the residual moisture content in 8 mesh coal instead of the 500–gram sample specified in the ASTM standards. This was done to reduce the size of the ovens necessary to effectuate the drying of the coal sample. Mr. Linton, one the plaintiff's experts, testified that the results obtained using the 10–gram sample had been crosschecked with results from other laboratories and the results were consistent. Tr. I, 199. The defendant's expert, Dr. Kuemmerle, testified that he did not know what the effect would be of using a 10–gram vis a vis a 500–gram sample. Tr. II, 32. In his opinion, however, use of the 10–gram sample would "tend to reduce the accuracy of the moisture determination." Id. 32. He did not specify how much the accuracy would be reduced nor the extent of the effect this may have had on calculation of the BTU value. Id. 33.

We find that use of the 10–gram sample did not result in unreliability of the residual moisture test on the 8 mesh coal sample. Dr. Kuemmerle's hypothesis was just that. He did not run independent tests to verify his opinion. On the other hand, the plaintiff introduced evidence that the results obtained using the 10–gram sample had been successfully crosschecked with other laboratories for accuracy. We think that the actual crosschecking of the results obtained using the 10–gram sample is the better method of ascertaining the reliability of such results.

Dr. Kuemmerle also testified that there was a third deviation from the ASTM standards in the plaintiff's testing process. He testified that the use of an 8 mesh coal sample was not a standard procedure in arriving at an "as received" moisture con-

2. The plaintiff sampled about 210 of the 323 railroad cars in which the coal in question was shipped. To get a representative sample under ASTM standards, the plaintiff needed to sample about 200 of the cars. Tr. I, 134–135.

tent and should be used only by prior agreement of the parties. The plaintiff's evidence showed, however, that it used a different ("two step") procedure in arriving at a determination of the total moisture content in the coal. See Exhibit 19. It therefore does not appear from the record that there was a third deviation from the ASTM testing standards.

13. In summary, we find that the plaintiff demonstrated by a preponderance of the evidence that the procedures it established and utilized for the sampling and testing of coal shipped pursuant to the contract in question were reasonable in nature and led to reasonably accurate results.

## II. *Conclusions of Law*

1. The contract provision relating to penalties and premiums, which is set out in Finding of Fact No. 4, provides in essence that the plaintiff agrees to sample and analyze the coal shipped under the contract but that if it does "not sample or analyze any of the coal received" pursuant to the contract, then it must pay the guaranteed BTU value. We disagree with the defendant's contention that this provision is ambiguous. "A contract is ambiguous only when it is of uncertain meaning and may fairly be understood in more ways than one. A strained construction may not be placed on the language used to find ambiguity where none exists." *Farmers–Peoples Bank v. Clemmer,* 519 S.W.2d 801, 805 (Tenn.1975). The "cardinal rule" in construing contracts "is to give effect to the intention of the parties in the light of the surrounding circumstances." *City of Memphis v. Ford Motor Co.,* 304 F.2d 845, 849 (6th Cir. 1962). A construction which is fair and reasonable in light of the intention of the parties is the goal to be sought. *Oman Construction Co. v. Tennessee Central Ry. Co.,* 212 Tenn. 556, 370 S.W.2d 563, 570–71 (1963).

We believe that the aforementioned provision in the contract must be construed to mean that the parties agreed that the plaintiff would pay the guaranteed BTU value of the coal delivered under the contract if it did not sample and analyze any portion of that coal. If, however, it sampled all or any portion of the coal, the parties agreed that a price adjustment in the contract could be made in the form of a premium or penalty if the BTU value of the coal were determined to be higher or lower than that guaranteed.

We believe that it would be unreasonable to construe the provision to mean that the plaintiff had to sample each carload of coal upon which it intended to impose a penalty. There are established procedures in the industry for taking representative samples of coal without sampling every carload. We simply do not believe that under all of the facts and circumstances of this case the parties intended the provision to mean that the plaintiff had to sample every carload before it could impose a penalty or that unless a particular carload was sampled no penalty on that carload of coal could be imposed. It was seemingly to the plaintiff's advantage to obtain a representative sampling of coal since it was obligated to pay a premium on the coal which exceeded the guaranteed BTU value.[3]

2. The defendant contends that the aforementioned provision in the contract was harsh and unjust, thereby rendering it unenforceable. *See Patterson v. Anderson Motor Co.,* 45 Tenn.App. 35, 319 S.W.2d 492 (1958). Under the particular facts and circumstances of this case we cannot agree. The proof showed that the plaintiff imposed upon itself a requirement that 30% of the coal on an order be sampled before a penalty was imposed. In fact, it sampled about 65% of the coal shipped under the contract in question. The defendant's own expert acknowledged that a representative sample could be obtained if approximately this percentage of coal were sampled.

The objective of the purchase order's "penalty/premium" price adjustment clause

---

**3.** The sampling process was separated in time from the testing and analysis process. We therefore do not see how the sampling process could have been manipulated by the plaintiff to the defendant's disadvantage. We do not understand the defendant to contend that such manipulation occurred; rather it contends that the sampling process was inadequate.

was to allow the defendant to be paid for the actual number of BTU's it sold to the plaintiff or, stated alternatively, to ensure that the plaintiff was required to pay for the actual number of BTU's it received. The price paid per BTU remained constant. Thus, the penalty assessed against the defendant was reasonable because it merely reflected the difference in the price for the BTU's which the plaintiff actually received and those for which it had already paid. It was more of a price adjustment than a "penalty".

3. Implied in the contract provision relating to sampling and analysis of coal was the requirement that the plaintiff exercise good faith and commercial reasonableness in the methods it used to sample and analyze the coal in question. T.C.A. § 47–2–311(1).[4] We believe that the central issue in this case is whether this test was met.

4. We cannot agree with the defendant that the deviations from the ASTM standards mentioned above[5] constituted a breach of the contract or otherwise operate to bar the plaintiff's claim. The ASTM standards are voluntary in nature. Adherence to or departure from those standards is probative of whether or not sampling or analysis procedures are likely to produce reasonably accurate or reliable results. But, we do not believe that absolute adherence to all of the ASTM standards was an implied term in the contract as contended by the defendant.[6] In any event, the two deviations that were shown did not interfere with the accuracy and reliability of the results obtained in the defendant's laboratory.

5. We therefore conclude that the plaintiff exercised good faith and commercial reasonableness under the facts of this case

with regard to its sampling and analysis procedures and practices and therefore is entitled to recover on its claim.

### III. *Recommendation*

Based on the foregoing, it is recommended that judgment enter in favor of the plaintiff in the amount of $45,623.49.

Respectfully submitted,
(s) Robert P. Murrian
UNITED STATES MAGISTRATE

---

4. This statute provides:

Options and cooperation respecting performance.–(1) An agreement for sale which is otherwise sufficiently definite (subsection (3) of § 47–2–204) to be a contract is not made invalid by the fact that it leaves particulars of performance to be specified by one of the parties. Any such specification must be made in good faith and within limits set by commercial reasonableness.

5. Finding of Fact No. 12.

6. The defendant's expert, Dr. Kuemmerle, testified that the coal analysis laboratory he organized and which he supervises produces reasonably accurate results. He acknowledged on cross–examination that ASTM standards and procedures are generally followed in his laboratory but that there are some deviations. He testified that the results obtained in his laboratory were reliable. Tr. II, 41–44.