The STATE of Wyoming, Ed Herschler, Thyra Thomson, James B. Griffith, Stan Smith and Lynn Simons, as members of the Board of Land Commissioners, and James B. Griffith, as State Auditor, and Howard Schrinar, as Commissioner of Public Lands, Appellants (Defendants),

v.

DAVIS OIL COMPANY, Appellee (Plaintiff).

DAVIS OIL COMPANY, Appellant (Plaintiff),

v.

The STATE of Wyoming, Ed Herschler, Thyra Thomson, James B. Griffith, Stan Smith and Lynn Simons, as members of the Board of Land Commissioners, and James B. Griffith, as State Auditor, and Howard Schrinar, as Commissioner of Public Lands, Appellees (Defendants).

Nos. 86-70, 86-71.

Supreme Court of Wyoming.

Nov. 25, 1986.

A.G. McClintock, Atty. Gen., Michael L. Hubbard, Senior Asst. Atty. Gen., and Vicci M. Colgan and Clinton D. Beaver, Asst. Attys. Gen., and Michael R. O'Donnell, Sp. Asst. Atty. Gen., for appellants in Case No. 86-70 and appellees in Case No. 86-71.

Jack D. Palma, II and Donald I. Schultz of Holland & Hart, Cheyenne, and James P. Regan and Patrick B. Seferovich of Davis Oil Co., Denver, Colo., for appellee in Case No. 86-70 and appellant in Case No. 86-71.

Before THOMAS, C.J., and BROWN, CARDINE, URBIGKIT and MACY, JJ.

MACY, Justice.

These are the second and third in a series of cases before this Court involving the interpretation of the royalty clauses contained in State of Wyoming oil and gas leases. The district court granted partial summary judgment in favor of the State, and both parties have appealed.

We reverse in part and affirm in part.

Davis Oil Company is the leasehold owner of certain oil and gas interests owned by the State of Wyoming in Converse County, Wyoming. Davis produces oil from two

wells on the leased premises, Concamp State No. 1 and Concamp State No. 2. Associated with the production of oil from the wells is the production of casinghead gas, which is the subject of this appeal. As it is produced, the gas is transported by Davis to a separator on the leased premises where water and other impurities are removed. Then, pursuant to gas purchase contracts with Davis, Phillips Petroleum Company transports the gas from the separator via pipeline to a processing plant near Douglas, Wyoming. Both the pipeline system and the processing plant are owned by Phillips. Before the gas leaves the leased premises, it is metered and tested by Phillips. It then enters the pipeline where it is commingled with gas produced from other nearby fields. At the plant, natural gas liquid is separated and transported by Phillips to its refinery in Texas. The remaining gas is sold by Phillips at its Douglas plant.

Phillips pays Davis for the gas by first calculating the amount of gas contributed to the pipeline system by Davis according to the measurements taken on the leased premises. That amount is then multiplied by a percentage of the price received by Phillips for the sale. Using the resulting figure, Phillips computes the royalty due the State and deducts it from the amount paid to Davis.

Royalties from the sale of casinghead gas produced under the Concamp lease have been paid to the State on the basis of the amount realized from such sales. When the State advised Davis that it believed the royalty payments to be inadequate, Davis filed a complaint in district court seeking a declaratory judgment that royalties due the State for production under the Concamp lease had been properly calculated in accordance with the lease terms. The pertinent portion of the lease provides as follows:

"(d) ROYALTIES. The royalties to be paid by lessee are: * * * (ii) *on gas,*

*including casinghead gas* or other hydrocarbon substance, produced from said land saved and *sold or used off the premises or in the manufacture of gasoline or other products* therefrom, the *market value* at the well of one-eighth of the gas so sold or used, provided that on *gas sold at the wells* the royalty shall be one-eighth of the *amount realized* from such sale." (Emphasis added.)

Applying this language, Davis' position before the district court was that the sale of casinghead gas from the Concamp wells is a sale "at the wells." On that basis, Davis argued that the royalty should be calculated according to "the amount realized." The State asserted that the sale of gas from the Concamp lease is not a sale at the wells; rather, the gas is "sold * * * off the premises," "used off the premises," and "used * * * in the manufacture of gasoline or other products." Thus, the State argued that the proper standard for calculating royalties is market value. In addition, the State argued that, regardless of the point of sale or the standard for calculating royalties, the lessor-approval and federal-floor provisions of the lease must be satisfied.[1] The parties stipulated to the facts, and both filed motions for summary judgment.

The district court denied Davis' motion and granted partial summary judgment for the State. In its final declaratory judgment order, the district court found generally that the gas produced from the Concamp lease is not sold "at the wells" for purposes of calculating royalties but is instead "saved and sold or used off the premises or in the manufacture of gasoline or other products." On that basis, the district court found that the royalties are to be calculated according to market value. The district court also found that the lessor-approval and federal-floor provisions of the lease have been supplanted by the market-value/amount-realized provisions.

---

1. See *State v. Moncrief,* Wyo., 720 P.2d 470 (1986), for a discussion of these provisions of the lease.

In its appeal before this Court, the State asserts the following claims:

"I. Must all parts of the royalty clause in this case be reconciled and construed in harmony and thereby avoid rendering the 'Lessor approval' and 'federal minimum' provisions meaningless?

"II. Did the district court misconstrue the nature of the school land trust and its effect upon the royalty clause in this case?"

Our holding in *State v. Moncrief*, Wyo., 720 P.2d 470 (1986), is dispositive of these claims. In accordance with that opinion, we reverse the district court's order to the extent that it held the lessor-approval and federal-floor provisions are superseded by the market-value/amount-realized provision.

We are left to consider the single issue raised by Davis in its appeal from the district court's order:

"DID THE DISTRICT COURT ERR IN FINDING DAVIS OIL COMPANY'S CASINGHEAD GAS SALES WERE NOT 'AT THE WELLS' WITHIN THE MEANING OF THE STATE OF WYOMING OIL AND GAS LEASE?"

As indicated by the lease language quoted earlier, the standard used for calculating royalties is dependent upon whether the gas is sold "at the wells" or "saved and sold or used off the premises or in the manufacture of gasoline or other products." In claiming that the gas from the Concamp lease is sold "at the wells," Davis relies in part on the following provision of its gas purchase contracts with Phillips:

"Gas shall be delivered at the inlet of Buyer's facilities at the point or points of separation of oil and gas * * *. *Upon delivery, title to the gas and all components thereof shall pass to and vest in Buyer* without regard to the purposes for which it may thereafter be sold or used by Buyer." (Emphasis added.)

According to Davis, a sale necessarily occurs when title to the gas passes to Phillips. Because the contracts provide that title passes upon delivery and delivery occurs on the leased premises, Davis asserts that the sale is "at the wells." We do not agree.

As the district court stated in its decision letter, there is no question that title to the gas passes from Davis to Phillips at the separator on the leased premises. However, the passage of title does not determine whether gas is sold "at the wells" nor does it trigger the amount-realized provision.

In *Piney Woods Country Life School v. Shell Oil Company*, 726 F.2d 225, reh. denied 750 F.2d 69 (5th Cir.1984), cert. denied 471 U.S. 1005, 105 S.Ct. 1868, 85 L.Ed.2d 161 (1985), Shell Oil Company leased certain oil and gas interests from Piney Woods pursuant to leases containing royalty provisions identical in all relevant respects to the provision in dispute here. Shell Oil Company thereafter entered into a contract for the sale of gas with MisCoa, which contract provided that title to the gas passes in the field. Despite this provision, the Fifth Circuit Court of Appeals found that the gas was not sold at the well and consequently that the royalties due must be computed on the basis of "market value at the well" rather than the amount realized. In reaching this result, the court reasoned that:

"[T]he purpose of the distinction between gas sold at the well and gas sold off the lease * * * is to distinguish between gas sold in the form in which it emerges from the well, and gas to which value is added by transportation away from the well or by processing after the gas is produced. The royalty compensates the lessor for the value of the gas at the well: that is, the value of the gas after the lessee fulfills its obligation under the lease to produce gas at the surface, but before the lessee adds to the value of this gas by processing or transporting it. When the gas is sold at the well, the parties to the lease accept a good-faith sale price as the measure of value at the well. But when the gas is sold for a price that reflects value added to the gas after production, the sale price will not neces-

sarily reflect the market value of the gas at the well. Accordingly, the lease bases royalty for this gas not on actual proceeds but on market value.

" 'At the well' therefore describes not only location but quality as well. Market value at the well means market value before processing and transportation, and gas is sold at the well if the price paid is consideration for the gas as produced but not for processing and transportation." 726 F.2d at 231.

Applying that reasoning to the facts before it, the court concluded

"that the gas sold by Shell was not 'sold at the well', within the meaning of the lease, even though the sale contracts provide that title to the gas passes on or near the leased premises. Under the MisCoa contract, * * * title passes in the field but the sale price is not determined until after the gas is processed and transported to Yazoo City. The sour gas is metered in the fields, but this measurement appears to be of little significance. MisCoa effectively pays only for the amount of sweet gas delivered at Yazoo City, and pays a price commensurate with the value of sweet gas at the time the contract was made." Id. at 231.

Davis attempts to distinguish between Piney Woods Country Life School and the present case by asserting that the focus of inquiry established in Piney Woods Country Life School is the activity of the lessee. That is, Davis contends that the Fifth Circuit Court of Appeals reached the result it did because in that case the *lessee* transported the gas off the leased premises, processed it, and thereby added value to it prior to sale, whereas in the present case the buyer, Phillips, did the transporting and processing after taking custody and control of the gas from the lessee, Davis, on the leased premises. We are not persuaded by Davis' claim.

■ The focus of inquiry established in Piney Woods Country Life School is quite clearly the quality and location of the gas when it is sold. In that case, the lessee was paid for sweet gas in Yazoo City, not

sour gas at the well. For that reason, the Fifth Circuit Court of Appeals determined that market value, rather than the amount realized, was the proper standard for calculating royalties. In the present case, Davis is paid for processed gas in Douglas, not casinghead gas at the wells. Accordingly, we find that market value, not the amount realized, is the proper standard for calculating royalties due the State. As the district court concluded:

"[T]he royalty to be received by the lessor is not finally determined, and in fact cannot be so determined, until the gas has been processed. Under the facts of the instant case, the State of Wyoming as lessor does not receive a royalty on gas sold 'in the form in which it emerges from the well' * * * but receives a royalty based upon a percentage of the proceeds of products extracted from the gas through processing."

Under these circumstances, we agree that these do not constitute sales "at the wells" within the meaning of the lease language.

Despite our agreement as to the point of sale, we do not incorporate entirely in our decision the reasoning given by the district court in support of its holding. The district court, like the Fifth Circuit Court of Appeals in Piney Woods Country Life School, was motivated in part by a concern that a finding that the point of sale rests entirely on the passage of title would lead to manipulation by lessees. While we recognize the potential for such manipulation, we find the lease language itself to be sufficiently clear and unambiguous to support our finding that the sale of gas produced by Davis from the Concamp wells constitutes a sale off the premises, invoking the market-value standard for calculating royalties.

For the reasons stated, the district court's order is affirmed with respect to the point of sale and reversed in accordance with *State v. Moncrief* with respect to the lessor-approval and federal-floor provisions of the lease.

URBIGKIT, Justice, concurring in part and dissenting in part, with whom CARDINE, Justice, joins.

I concur with the court's conclusion that *State v. Moncrief,* Wyo., 720 P.2d 470 (1986) is determinative of the issues raised in the State appeal requiring reversal, but would also reverse on the Davis Oil appeal involving interpretation of the lease royalty payment pricing provision where product sale occurs at the wellhead.

The two-fold issue presented is whether the word "sold" as used in an oil and gas lease should be given its usual business deal interpretation as established by the Uniform Commercial Code, or if the involvement of a state lease leads to a different interpretation.

Technically, the producer of casing-head gas produced in conjunction with oil claims an "amount realized" royalty value, while the State claims a "market value" standard tied to both the processed natural gas and stripped hydrocarbons, determined after processing and resale by an independent third party.

The lease provision is specific and unambiguous:
> "* * * [P]rovided that on gas sold at the wells the royalty shall be one-eighth of the amount realized from such sale." (Emphasis added.)

Consequently, the dispositive royalty-valuation inquiry is whether the gas was "sold at the wells" pursuant to the lease terminology.

The sales agreement between producer Davis Oil, and buyer Phillips Petroleum is also before the court for construction, and is similarly uncomplicated in terminology:
> "Gas shall be delivered at the inlet of Buyer's facilities at the point or points of separation of oil and gas * * *. *Upon delivery, title to the gas and all compo-nents thereof shall pass to and vest in Buyer* without regard to the purposes for which it may thereafter be sold or used by Buyer." (Emphasis added.)

Davis maintained a separator near the wellsite to remove oil, water and other components not deliverable with natural gas. The separator was attached to the pipeline facilities owned and operated by Phillips Petroleum to transport gas from the field to its processing plant and gas collection system.

From two documents, the State lease and the Phillips sales agreement, the State contends and the majority apparently adopt a new principle that, even though title passes at the well, with the rights and responsibilities of possession and ownership, a sale has not then occurred for royalty pricing purposes.

Lacking the logical justification to differentiate sale ("sold") from passage of title with assumption of concurrent possessory rights and obligations by the buyer, I respectfully dissent.[1]

## I. FACTS AND GENERAL AUTHORITIES

The specific sales status requires factual clarification for legal analysis. The buyer, by the purchase contract, accepted right, title and interest for the metered gas at the wellsite separator. This gas, together with product from other suppliers, is collected for piping to a processing plant, including the processed product disposition facilities and customer sales arrangements. Wellhead quality of the gas was a matter of periodic analysis, and volumetric computations were continuously maintained. Based on the metered gas volume at wellhead, and adjusted by a quality factor, the price was determined on a unit basis by applying

---

**1.** In terms of practical oil-field operation in this case, the effort to differentiate market value at well from amount realized is similar to a number being six or only half a dozen. Since Davis then, or its successor Apache now, had a much greater interest as owner than the State as royalty holder, value and realized price encompass a much greater sophistication in bargaining ca-pacity than the State process will ever afford in audit contemplation. A product is not worth more than you can get for it. Willing buyers and available sellers of gas production are presently limited in the oil patch, and the available market in this time of gas surplus and shut-in gas wells makes this economic fact particularly notable.

a formula to what the processor, Phillips, received upon resale. Succinctly, the purchase-pricing obligation of Phillips was determined by subsequent resale value as determined by the posted field price in Texas and gas sales contracts at the Wyoming plant site.

The pricing system is accurately described by appellant Davis Oil:

"In general, the pricing mechanism is established to allow Phillips to 1) pay each producer a raw gas price calculated as a specified proportion of the tailgate value of the products produced from that producer's gas. Phillips retains the balance of any 'tailgate proceeds' to cover its processing costs and profit." [2]

It is apparently the fact that the buyer used a percentage of the resale value as a pricing index that accommodates the majority's position that the status of a sale at wellhead is changed when the price is determined by subsequent events.

Initially we are concerned whether the general rule now invoked by this court has only a peculiarly specified application to transactions with the State or is intended to reflect general rules and standards intrinsically involved in the law merchant, and more particularly in interpretation of the Wyoming Uniform Commercial Code, § 34–21–101 et seq., W.S.1977.

The product in this case was "sold at the well" by fact and definition, and we ought to determine whether, as a matter of contractual construction with the State or as a matter of business law, a fiction of nonsale at the well should now be created. Cognitive reasoning and logical result should satisfy fairness obligations to the State and its citizens for operational necessities while also accommodating the sale provisions of the Uniform Commercial Code and general standards of the law of commercial sales. " * * * It is true that in a technical sense, and where a due regard to the intention of the parties using the word 'sold' is had, it may mean a transfer of the title of property for a money consideration. Yet, it has other meanings which would include the present transaction, when it is obvious that such was the intent of the party using the phrase." *Culver v. Uthe*, 133 U.S. 655, 659, 10 S.Ct. 415, 417, 33 L.Ed. 776 (1890).

I would find *Piney Woods Country Life School v. Shell Oil Company*, 726 F.2d 225 (5th Cir.1984), reh. denied 750 F.2d 69, cert.

**2.** Two assumptions seem to spring from the State's brief and the trial court's decision.

The first is that a constructive reinterpretation of the State lease is justified in order to assure protection to the State in adequate receipt of royalty payments. In other words, what was inopportunely included in lease terminology should be reconstituted in order that, for example, "the producer could not determine the place of sale."

The second assumption is even more austere or unusual. It seems to be contended that somehow a market-value factor will favor the State economically under present circumstances. Obviously this can only be true if the State had the capacity and the time to determine that the operation of Phillips in result was so inefficient that the market value was diminished by inefficiency of operation. None of this seems to make any sense in the practical world of the limited auditing capacity of the State, the relatively small amount of dollars actually involved, and the singular interest of Davis in the greatest return possible for itself.

The motivating economic factor of Piney Woods, infra, as a method to escape from market value at contract date to market value at time of sale, is simply not reflected as a viable goal in the Phillips operation in the present period of national market conditions. By the time the nation gets back to a gas shortage, for a time-differential factor, even under the Phillips marketing process, recomputation would unlikely involve any dollar differences that would justify per diem and time for one State employee to drive one time to the Phillips facility in Campbell County from Cheyenne. Obviously, however, the fact that the State's position probably does not make any sense fiscally is no rational basis for an adverse resolution of language in their lease, but conversely the anticipation of something worthwhile in the State's demand and litigative effort does not per se justify a reconstituted interpretation of a relatively normal business transaction. Consideration of *Crosby-Mississippi Resources, Ltd. v. Saga Petroleum U.S., Inc.*, 767 F.2d 143 (5th Cir.1985), would cause question where any implication of benefit from the position of the State would be realized. That case teaches that the amount realized (from the raw gas) could be significantly less if determined after deduction of processor cost and profit in real-world, gas market terms of today.

denied 471 U.S. 1005, 105 S.Ct. 1868, 85 L.Ed.2d 161 (1985) neither controlling nor logically persuasive. In Piney Woods, Shell as the producer did not sell at wellhead, whether or not one construes title to have changed at that point for regulatory authority purposes, since Shell retained possession, control and utilization through processing for future tailgate sale of processed gas at its plant. The only delivery of possession and relinquishment of incidents of ownership occurred downstream after processing. The determination that title passed at the wellhead was in itself really fictional, since it was done to determine nonregulatory jurisdiction of a federal agency and not as a bona fide criterion for determining actual sale.

In this case, to the contrary, title was transferred, possession delivered, and responsibility assumed at wellhead. The only similarity is pricing, in that Shell in Piney Woods paid an amount based on what it got after processing, while in this case the variable pricing system arranged for purchase as an arm's length transaction between Davis and Phillips, was determined by application of the variable price to the volumetric amount of raw gas. In Piney Woods, Shell agreed to pay its raw gas royalty obligation based on processed revenue *to Shell*, which was based on inopportune long-term contracts at a time of increasing gas prices. See the excellent discussion on the interpretation of a gas-royalty clause found in *First National Bank of Jackson v. Pursue Energy Corporation*, 799 F.2d 149 (5th Cir.1986).

This case can be factually distinguished from *Kingery v. Continental Oil Co.*, 434 F.Supp. 349 (W.D.Tex.1977), reversed on other grounds 626 F.2d 1261 (5th Cir.1980), cert. denied sub nom. *Brent v. Natural Gas Pipeline Company of America*, 454 U.S. 1148, 102 S.Ct. 1012, 71 L.Ed.2d 302 (1982), where the producer pooled and delivered gas to the pipeline company buyer

approximately three and one-half miles off the lease premises, and from *Exxon Corporation v. Middleton*, Tex., 613 S.W.2d 240, 10 A.L.R.4th 712 (1981), where a construction of the lease clause determined whether the modifier "off the premises" applied to both "sold" and "used." The converse of the decision finding "used or sold off the leased premises" is involved in *Skaggs v. Heard*, 172 F.Supp. 813 (S.D.Tex.1959), where the buyer contended unsuccessfully for the off-the-premises construction in order to charge back proportionate repressuring costs. In that case, the court held that the buyer's repressuring equipment system arrangement did not change the site-of-sale fact, since the gas was sold and delivered to the pipeline on the lease. Similarly, in *Matzen v. Cities Service Oil Co.*, 233 Kan. 846, 667 P.2d 337 (1983), cert. dismissed sub nom. *Mobil Oil Corp. v. Batchelder*, 468 U.S. 1222, 105 S.Ct. 17, 82 L.Ed.2d 912 (1984), the trial court determination of sale off the premises as to Ashland Oil was affirmed based upon the producer maintaining the gathering system with delivery to the buyer at a central delivery point. See also *Shamrock Oil & Gas Corporation v. Coffee*, 140 F.2d 409 (5th Cir.), cert. denied 323 U.S. 737, 65 S.Ct. 42, 89 L.Ed. 591 (1944).

Here, the wellhead price for *Davis*, as vendor, was determined by value determinative process sales receipts obtained by *Phillips* at plant tailgate. A more nearly comparable case, although not similar in facts, is *Waechter v. Amoco Production Co.*, 217 Kan. 489, 537 P.2d 228, 546 P.2d 1320 (1975) (see also *Waechter v. Amoco Production Co.*, 219 Kan. 41, 546 P.2d 1320 (1976)), wherein the Kansas Supreme Court found a sale at wellhead. See also *Pierce v. Texas Pacific Oil Co., Inc.*, 547 F.2d 519 (10th Cir.1976) interpreting Oklahoma law; *Skaggs v. Heard*, supra; and *Exxon Corporation v. Middleton*, supra.[3]

---

**3.** Minimal consideration was given in Piney Woods to the point-of-sale issue, since obviously the real sale occurred off-premises. The economic issue of the case was time-factor determination of market value in consideration of long-term contracts with escalating normal market price conditions. In adopting the time of production rule, the decision was not based on a unanimous precedent. See also *Hillard v. Stephens*, 276 Ark. 545, 637 S.W.2d 581 (1982);

## II. INTERPRETATION OF STATE CONTRACTS

In this analysis of the State oil and gas lease form, we construe a document entered into between two negotiating participants. The rules should not differ in logic and principle as normally applied to any bilateral contract, with particular recognition that the lease form is "take it or leave it" for oil companies who do business with the State.

This is a contract case involving a product sale, and legal interpretations and conclusions should not be different from the result had two private parties been involved, or were a private royalty interest holder the present plaintiff. The law does not accept different standards of contractual interpretation for the government in business enterprise than afforded citizens who enter into identical relationships. The State of Wyoming wrote and required the lease form; there were no bilateral negotiations of any provision. As such, no greater benefit than linguistically justified should be afforded by judicial construction and interpretation. *Trustees of Dartmouth College v. Woodward*, 4 Wheat. 518, 17 U.S. 518, 4 L.Ed. 629 (1819).

Even before Trustees of Dartmouth College, the United States Supreme Court said:

"This is a contract; and although a state is a party, it ought to be construed according to those well established principles which regulate contracts generally." *Huidekoper's Lessee v. Douglass*, 3 Cranch 1, 70, 7 U.S. 1, 70, 2 L.Ed. 347, 369 (1805).

Consistent with this position, the Supreme Court again enunciated in *Ohio Life Insurance and Trust Company v. DeBolt*, 16 Howard 416, 429, 57 U.S. 416, 429, 14 L.Ed. 997 (1853):

"* * * If the contract [made by the state] was within the scope of the authority conferred by the constitution of the State, it is like any other contract made by competent authority, binding upon the parties. Nor can the people or their representatives, by any act of theirs afterwards, impair its obligation. When the contract is made, the Constitution of the United States acts upon it, and declares it shall not be impaired, and makes it the duty of this court to carry it into execution. That duty must be performed."

In *Davis v. Gray*, 16 Wall. 203, 233, 83 U.S. 203, 233, 21 L.Ed. 447 (1872), the Court again stated:

"That the Act of incorporation and the land grant here in question were contracts, is too well settled in this court to require discussion. *Fletcher v. Peck*, 6 Cranch, 137 [3 L.Ed. 162]; *N.J. v. Wilson*, 7 Cranch, 166 [3 L.Ed. 303]; *Dartmouth Coll. v. Woodward*, 4 Wheat., 518 [4 L.Ed. 629]; *Bk v. Knoop*, 16 How., 369 [14 L.Ed. 977]. As such, they were within the protection of that clause of the Constitution of the United States which declares that no State shall pass any law impairing the obligation of contracts."

*United States v. Diamond Coal & Coke Co.*, 254 Fed. 266, 268 (C.C.A.Wyo.), rev'd on other grounds 255 U.S. 323, 41 S.Ct. 335, 65 L.Ed. 660 (1918), involved an appeal from the United States District Court, District of Wyoming, wherein the Court of Appeals discerned:

"* * * The equitable claims of a nation or a state appeal to the conscience of a chancellor with the same, but with no greater or less force, than would those of a private citizen under like circumstanc-

---

*Texas Oil & Gas Corporation v. Vela*, Tex., 429 S.W.2d 866 (1968); *Tara Petroleum Corp. v. Hughey*, Okla., 630 P.2d 1269 (1981), cert. denied sub nom. *Shell Oil Company v. Piney Woods Country Life School*, 471 U.S. 1005, 105 S.Ct. 1868, 85 L.Ed.2d 161 (1985); *Henry v. Ballard & Cordell Corp.*, La., 418 So.2d 1334 (1982), cert. denied sub nom. *Shell Oil Company v. Piney Woods Country Life School*, supra. In *Henry v. Ballard & Cordell Corp.*, Louisiana chooses a

point in time in the market value gas royalty controversy. Note, *Henry v. Ballard & Cordell Corp.: Louisiana Chooses A Point in Time in the Market Value Gas Royalty Controversy*, 43 La.L. Rev. 1257 (1983). An analysis of the issue of Piney Woods market price versus market value is found in Harris, *Gas Royalties—Leading State and Federal Cases Reviewed: Alice's Adventures in "Royalty-Land"*, 37 Okla.L.Rev. 699 (1984).

es, and, barring the effect of mere delay, they are judicable in a court of chancery, to whose jurisdiction the nation or state voluntarily submits them, by every principle and rule of equity applicable to the rights of a private citizen under similar circumstances."

The general rule is similarly stated:

"As to its contract, the state should be held to the same rules and principles of construction and application of contract provisions as govern private persons and corporations in contracting with each other." 72 Am.Jur.2d States, Territories, and Dependencies § 73, p. 468.

See also 81A C.J.S. States § 168, p. 632. Wyoming cases, although not specifically directed to an exception criterion are not inapposite. *Wyoming Game & Fish Commission v. Mills Company*, Wyo., 701 P.2d 819 (1985); *State Highway Commission of Wyoming v. Brasel & Sims Construction Co., Inc.*, Wyo., 688 P.2d 871 (1984); *National Surety Co. v. Morris*, 34 Wyo. 134, 241 P. 1063 (1925); *State ex rel. Fitch v. State Board of School Land Commissioners of Wyoming*, 27 Wyo. 54, 191 P. 1073 (1920).

### III.  APPLICATION OF UNIFORM COMMERCIAL CODE

My difference with the majority in reasoning invokes the contractual provisions and the law of sales under the Uniform Commercial Code as applied to the wellhead sale criteria of the state lease. The provisions of the Phillips purchase agreement to be analyzed are (a) designated point of sale; (b) title change; (c) delivery of possession and custody; and (d) purchase price determined by value added factors upon use by the purchaser. The critical inquiry is whether under general business law the price-determination factor changes the point of sale where all other determinative factors for a "sale" do exist. Extensive authorities uniformly answer in the negative. *Franklin Fibre-Lamitex Corp. v. Director of Revenue*, Del.Supr., 42 U.C.C.Rep. 1205, 505 A.2d 1296 (1985), where the U.C.C. is used to define "sold

within the state for tax within the state" for tax purposes; *Mari v. Wagner Equipment Co., Inc.*, Colo.App., 42 U.C.C.Rep. 1634, 721 P.2d 1208 (1986), where conversion of a scraper after "sale" was required; *IUE AFL–CIO Pension Fund v. Barker & Williamson, Inc.*, 1 U.C.C.Rep.2d 205, 788 F.2d 118 (3d Cir.1986), "the parties if they so intend can conclude a sale even though the price is not settled"; *Bornstein v. Somerson*, Fla.App., 21 U.C.C.Rep. 36, 341 So.2d 1043 (1977), sale of citrus crops; *Columbus Milk Producers' Cooperative v. Department of Agriculture*, 8 U.C.C.Rep. 481, 48 Wis.2d 451, 180 N.W.2d 617 (1970), executory sale of milk; *Schmieder v. Standard Oil Co. of Indiana*, 17 U.C.C.Rep. 360, 69 Wis.2d 419, 230 N.W.2d 732 (1975), filling station equipment price subject to negotiation; *Barker v. Allied Supermarket*, Okla.App., 20 U.C.C.Rep. 6 (1976), injury from store merchandise before reaching checkout counter constituted a sale upon pickup with intent to purchase. See also *Fender v. Colonial Stores*, 138 Ga.App. 31, 225 S.E.2d 691 (1976); *Desbien v. Penokee Farmers Union Cooperative Association*, 220 Kan. 358, 20 U.C.C.Rep. 102, 552 P.2d 917 (1976), sale of wheat completed upon delivery to elevator; *First National Bank of Elkhart County v. Smoker*, 153 Ind. App. 71, 11 U.C.C.Rep. 10, 286 N.E.2d 203, reh. denied 153 Ind.App. 71, 287 N.E.2d 788 (1972), possession of cattle determinative although grade and weight after slaughter would determine the price; *American Petrofina, Inc. v. PPG Industries, Inc.*, Tex. App., 40 U.C.C.Rep. 816, 679 S.W.2d 740 (1984), three million gallons of deisel fuel had been "sold" by designation in storage tank; *Salinas v. Flores*, Tex.Civ.App., 583 S.W.2d 813 (1979), sale of watermelons; *Georgia Power Co. v. East Tennessee Fuel, Inc.*, 496 F.Supp. 626 (E.D.Tenn. 1980), coal price determined by delivery point b.t.u. testing. This listing may be belabored, but the authorities are multi-faceted, numerous, and consistent.

In *Piney Woods*, as in many similar authorities on the marketprice time-determination questions, consistent application of the Uniform Commercial Code exists. The

decision here must be justified by application of Wyoming statutes and the U.C.C. principles, since no exclusion or exception for the State or its instrumentalities was provided in either the generally adopted Uniform Commercial Code or the specific Wyoming statutes.

## IV. WYOMING STATUTES ON SALES

Appropriate sections of the Wyoming code include § 34–21–206 (U.C.C. 2–106(a)), defining sale:

"(a) In this article unless the context otherwise requires 'contract' and 'agreement' are limited to those relating to the present or future sale of goods. 'Contract for sale' includes both a present sale of goods and a contract to sell goods at a future time. A 'sale' consists in the passing of title from the seller to the buyer for a price (section 2–401 [§ 34–21–246]). A 'present sale' means a sale which is accomplished by the making of the contract."

§ 34–21–246 (U.C.C. 2–401), passing of title:

"(a) Each provision of this article with regard to the rights, obligations and remedies of the seller, the buyer, purchasers or other third parties applies irrespective of title to the goods except where the provision refers to such title. Insofar as situations are not covered by the other provisions of this article and matters concerning title become material the following rules apply:

"(i) Title to goods cannot pass under a contract for sale prior to their identification to the contract (section 2–501 [§ 34–21–249]), and unless otherwise explicitly agreed the buyer acquires by their identification a special property as limited by this act [§§ 34–21–101 to 34–21–1002]. Any retention or reservation by the seller of the title (property) in goods shipped or delivered to the buyer is limited in effect to a reservation of a security interest. Subject to these provisions * * *, title to goods passes from the seller to the buyer in

any manner and on any conditions explicitly agreed on by the parties;

"(ii) Unless otherwise explicitly agreed title passes to the buyer at the time and place at which the seller completes his performance with reference to the physical delivery of the goods, despite any reservation of a security interest and even though a document of title is to be delivered at a different time or place; and in particular and despite any reservation of a security interest by the bill of lading: * * *,"

and § 34–21–222 (U.C.C. 2–305), open price:

"(a) The parties if they so intend can conclude a contract for sale even though the price is not settled. In such a case the price is a reasonable price at the time for delivery if:

"(i) Nothing is said as to price; or

(ii) The price is left to be agreed by the parties and they fail to agree; or

"(iii) The price is to be fixed in terms of some agreed market or other standard as set or recorded by a third person or agency and it is not so set or recorded.

"(b) A price to be fixed by the seller or by the buyer means a price for him to fix in good faith."

Many years ago, Justice Blume made a succinct and expressive comment in terminology not really changed by U.C.C. provisions of present law:

"It would seem to us that the term 'sales' or 'when sold' are terms too plain to be construed away by a court. Thus we find in * * * *In re Frank's Estate*, 154 Misc. 472, 277 N.Y.S. 573, where it is stated that 'a "sale" in legal nomenclature, is a term of precise legal import, both at law and in equity, and has well defined legal signification, and has been said to mean at all times a contract between parties to give and to pass rights of property.' * * * There must be, it is stated, a consideration or price, a seller, a purchaser and a delivery of the thing sold." *State v. Yellowstone Park Co.*, 57 Wyo. 502, 121 P.2d 170, 171, cert. denied 316 U.S. 689, 62 S.Ct. 1280, 86 L.Ed. 1760 (1942).

## V. CIRCUMSTANCE DELIVERY CONCLUSION

The "dependent upon the circumstance" rule as the essence of the transaction was clearly defined in the early case of *Hathaway v. Burr*, 8 Me. 567, 570–571 (1842):

" * * * The meaning will usually be clearly ascertained by the words used in connexion with it, or by the circumstances developed. * * *

" * * * [T]here can be little safety in attaching a legal meaning to the word, when separated from the connexion or circumstances in which it is used. It is necessary therefore to advert to the facts disclosed in the case * * *."

See *Morris v. Perkins Chevrolet, Inc.*, Mo. App., 663 S.W.2d 785 (1984); *Jackson v. Meadows*, 153 Ga.App. 1, 264 S.E.2d 503 (1980). See also *Radloff v. Bragmus*, 214 Minn. 130, 7 N.W.2d 491 (1943); Uniform Commercial Code Section, *The Passage of Title*, 14 Wyo.L.J. 17, 25 (1959); Note, *Failure to Include All Material Terms Under the Uniform Commercial Code "The Open Terms Contract"*, 19 Wyo.L.J. 80, 83 (1964).

In the nature of things, all gas is generally both used and sold off the premises in disassociated home or factory. Clearly the State, in drafting the lease form, contemplated two alternatives: (1) the producer sells gas at the well to a marketer, distributor or user; or (2) the producer moves the gas off the premises to the point of use or to be sold to someone else.

It seems clear that in this case Davis sold to Phillips at the well for shipment of the raw product to its off-lease processing plant.

The effect of the new rule created by the majority opinion is that if the formula for determining the original purchase price includes the buyer's resale value, then the legal status of the transaction as a sale at the wellhead becomes discombobulated. The majority create a new and unusual rule in the law of sales that a subsequent event pricing index is relevant to the status of the sale, even where, in accord with the agreement, (a) title is transferred; (b) possession is transferred; and (c) right and responsibility for the product is assumed by the buyer. The majority's erroneous conclusion stems from their failure to differentiate the legal sale from a pricing function embodied in the sale agreement.

" * * * In short, the court looks to the language of the contract and its commercial (or in this case, regulatory) context. U.C.C. § 1–205, Official Comment 1, § 2–202 & Official Comment 1 & 2." *Pennzoil Company v. Federal Energy Regulatory Commission*, 645 F.2d 360, 388 (5th Cir.1981) cert. denied 454 U.S. 1142, 102 S.Ct. 1000, 71 L.Ed.2d 293 (1982).

See also *Amoco Pipeline Co. v. Admiral Crude Oil Corp.*, 490 F.2d 114 (10th Cir. 1974); *Shamrock Oil & Gas Corporation v. Coffee*, supra.

It is absolutely clear from the terminology of the Code and the case law that has followed that the commercial law requires consideration of the essence of the transaction to determine whether a sale has occurred, as differentiated from the passage of title as the only determinate. *United States v. Balanovski*, 236 F.2d 298 (2d Cir.1956), cert. denied 352 U.S. 968, 77 S.Ct. 357, 1 L.Ed.2d 322 (1957). The Wyoming Supreme Court specifically recognized this rule in *Park County Implement Co. v. Craig*, Wyo., 397 P.2d 800 (1964).

If a sale can be accomplished with open price terms, in accord with § 34–21–222, W.S.1977, then surely a sale can be accomplished with a factored price by formula. The volume of cases is considerable in number in commodity transactions when the price determinates may be subject to subsequent events after the contractual sale is consummated. As a matter of fact, the transaction is similar to a course of business of extended nature in Wyoming wherein barley growers contract to sell their product to brewers with the ultimate price to be varied by quality conditions determinable after delivery and by final test conducted either at buyer's delivery point or plant site in other states. Turkeys are graded; eggs are candled; wheat is tested for moisture content; grass seed is

delivered by percentage of purity; oil is sometimes valued by viscosity and impurities; and, perhaps not totally irrelevant, even legal services are valued at their conclusion upon results obtained. *Friedsam v. Sawan Inc.,* 103 Ga.App. 500, 119 S.E.2d 707 (1961); *Pittsburgh, C., C. & St. L. Ry. Co. v. Knox,* 177 Ind. 344, 98 N.E. 295 (1912).

The State of Wyoming offered and required a lease form which determined the measure of royalty payments based upon a status well recognized as determinable from the events and agreement. This dissent is not based only on the technical title status, but rather on the totality of incidents in the sales transaction, including title, possession and assumption of ownership functions as clearly defined in the sales agreement, and general standards of business practice.

I would reverse since the trial court erred in applying an amount-realized standard contrary to both the lease and the product sales agreement.